663 P.2d 1012

ARIZONA LOTUS CORP.; Arizona Television Company; B & D Broadcasting, Inc.; Grand Canyon Broadcasters, Inc.; ITC Communications of Arizona, Inc.; KASA, Inc.; KOOL-Radio Television, Inc.; KTAR Broadcasting Company and KXIV, Inc., Arizona corporations, and Doubleday Broadcasting Company, Inc.; Eller Outdoor Advertising Co. of Arizona; Harte-Hanks Southern Communications, Incorporated; KIFN Radio, Inc.; Meredith Corporation; Harold S. Schwartz and Associates, Inc.; and Southern Broadcasting Company, foreign corporations, Plaintiffs-Appellants, Cross Appellees,

v.

CITY OF PHOENIX, a municipal corporation of the State of Arizona, Defendant-Appellee, Cross Appellant.

No. 1 CA–CIV 5494.

Court of Appeals of Arizona, Division One, Department D.

March 24, 1983.

Rehearing Denied May 4, 1983.

City of Phoenix by Andy Baumert, City Atty. and Philip M. Haggerty, Asst. City Atty., Phoenix, for defendant-appellee, cross appellant.

Snell & Wilmer by Edward Jacobson, and Richard K. Mahrle, Phoenix, for plaintiffs-appellants, cross appellees.

## OPINION

HAIRE, Presiding Judge.

Appellants, a group of Phoenix broadcasters and a billboard company, challenge in several respects the legality of taxes assessed by the City of Phoenix (City) pursuant to its privilege tax on advertising. The issues involved in this appeal include:

(1) whether the City properly taxed revenues generated by national advertising from November 1, 1977 through December 19, 1978;

(2) whether the City properly taxed revenues generated by spot religious announcements; and

(3) whether the City properly taxed revenues generated by the production of commercials (production revenues).[1]

The general facts necessary to the resolution of these issues are as follows.

Until November 1977, appellants paid privilege taxes on revenues generated by local advertising only. In October 1977, the City directed a letter to all Phoenix businesses engaged in the business of advertising indicating that *all* revenue received by local firms for advertising, including national advertising, would be subject to the privilege tax, effective November 1, 1977. This letter constituted a non-retroactive interpretation of the City's privilege tax code based upon recent United States Supreme Court cases which lessened the restrictions imposed on local taxation by the commerce clause. The City sent a second letter to taxpayers on December 28, 1977 which (1) outlined procedures for paying the tax while preserving the right to protest and (2) indicated that production revenues were subject to the privilege tax.

Pursuant to stipulation with the City, the appellants filed a consolidated petition for hearing to protest this tax treatment. A hearing on the petition was conducted which resulted in findings against the appellants. Appellants then filed an action against the City in the Maricopa County Superior Court to challenge the rulings of the City's hearing officer. The trial court subsequently held that revenues derived from national advertising and spot religious announcements were taxable, and that production revenues were not taxable. Appellants timely appealed and the City cross-appealed. More specific facts will be incorporated into the discussion of each issue.

## NATIONAL ADVERTISING

In general, the advertising portion of the appellants' broadcasting format has two components. Local advertising is contracted for between the station and the local advertiser or its agency. National advertising is contracted for and originates elsewhere. Most frequently, radio and television stations employ a national representative firm, located outside Phoenix, that so-

---

1. At oral argument, counsel waived an additional issue involving the application of penalty provisions of the city code.

licits and sells advertising time to national advertisers.[2]

While the superior court action was pending, the Phoenix City Council amended the city code to add a definition of "local advertising" and to restrict the advertising privilege tax to revenues derived from "local advertising" only. This amendment excluding national advertising from taxation by the City was effective December 19, 1978. Thus, appellants seek the recovery of taxes paid on national advertising prior to amendment of the city code, during the period from November 1, 1977, to December 19, 1978.

The City claimed the right to tax national advertising pursuant to City Code Section 14–2(a)(15),[3] which imposed the privilege tax on:

"Advertising by billboards, direct mail, radio, television, or by any means calculated to appeal to prospective purchasers."

Appellants argue that the City's expanded interpretation of the code provision constituted an unlawful imposition of a new tax on revenues derived from national advertising. In support of this contention, appellants make three arguments:

(1) the treatment of national advertising revenues from 1956 until 1977 established a conclusive administrative practice to exempt such revenues from the privilege tax;

(2) national advertising was not taxed prior to 1977 because of the questionable constitutionality of such a tax; and

(3) the City could not tax national advertising revenues without first complying with Section 14–44 which requires that the City Council approve an interpretative rule or regulation.

We proceed to address each of these arguments.

To establish a previous administrative practice of interpreting the code as exempting national advertising revenues, appellants cite: (1) a 1956 letter from the city assessor as limiting the scope of privilege taxes to revenues generated by local advertising; (2) the City's auditing history indicating a practice of not taxing revenues generated by national advertising; and (3) the previously referred-to October 1977 letter to the appellants from the City. The letter expressly refers to the imposition of the tax on national advertising revenues as a "review" of the City's interpretation, making the new interpretation prospective only. The appellants also point out that the October 1977 letter indicated the City's intention to draft a new regulation concerning the imposition of the tax on national advertising revenues.

■■■ From the foregoing we find a history of administrative interpretation and practice restricting the application of the City's privilege tax to local advertising revenues. However, even where there is a clear administrative practice of applying the taxing statutes in a certain manner, that practice does not mandate continued adherence where the taxing statute is clear and requires a different result. *See Southern Pacific Co. v. Cochise County,* 92 Ariz. 395, 406, 377 P.2d 770, 778 (1963); *DeWitt v. Magma Copper Co.,* 16 Ariz.App. 305, 308, 492 P.2d 1243, 1246 (1972). Furthermore, continued failure to collect a tax does not preclude eventual taxation. *See Miami Copper Co. v. State Tax Commission,* 121 Ariz. 150, 153, 589 P.2d 24, 27 (App.1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979).

In this case, the language of Section 14–2(a)(15) is clear. It imposes a tax on revenues generated by "advertising" without

---

**2.** Television stations with network affiliations also utilize a third type of advertising. The networks solicit and contract for these advertisements, which appear as part of the network programming. The network then pays the local affiliate for the broadcast time used. The City has not imposed a privilege tax on broadcast revenues generated in this way.

**3.** The amended version of this section is currently Section 14–2(a)(1). All references to city code sections will be to the versions existing at the time of this litigation unless otherwise specified.

distinguishing between "local" and "national." We note that the subsequent act of amending the ordinance to restrict the privilege tax to "local advertising" suggests that the pre-amendment version of the ordinance was broad enough to include national advertising. Appellants cite, however, Section 14–8 of the city code which provides:

"**Sec. 14–8. Exemptions in accordance with constitutional prohibitions.**

"The taxes herein levied shall not be construed to apply to transactions in interstate commerce which, under the Constitution of the United States, the state is prohibited from taxing or upon any sales made to the United States Government, its departments or agencies, nor to business or transactions exempted from taxation under the Constitution of the United States or the constitution of the state."

Appellants contend that this code section has adopted by reference art. I, § 8, cl. 3 of the United States Constitution, commerce clause. They urge that Section 14–8 incorporates the meaning of the commerce clause as interpreted when the section was adopted initially in 1949. This is the so-called "snapshot" rule.

Appellants maintain that until the United States Supreme Court's decision in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the taxation by the City of revenues derived from national advertising would have been unconstitutional as a direct burden on interstate commerce. They cite several cases to illustrate that the interpretations of the commerce clause prevailing in 1949 prohibited the imposition by a city or state of a privilege tax on revenues derived from national advertising. Appellants then urge that this was the interpretation adopted through Section 14–8 and incorporated into Section 14–2(a)(15). They argue that any subsequent judicial modifications of the interpretation of the commerce clause, including the *Brady* sanctioning of privilege taxes placed on interstate commerce, can be a part of Section 14–8 only if expressly intended by the City Council.

The cardinal rule in statutory interpretation is to determine the intent of the legislative body. *E.g., Mardian Construction Co. v. Superior Court,* 113 Ariz. 489, 492, 557 P.2d 526, 529 (1976); *Sandblom v. Corbin,* 125 Ariz. 178, 182, 608 P.2d 317, 321 (App.1980). In construing a statute, the court need not resort to rules of construction or interpretation if the language is plain. *Continental Casualty Co. v. Industrial Commission,* 113 Ariz. 116, 118, 547 P.2d 470, 472 (1976). We have previously found that Section 14–2(a)(15) applies the privilege tax to revenues generated by "advertising." This broad language distinguishes this case from those cited by appellants in which courts struck down attempts to expand the scope of taxing statutes without legislative action. *See, e.g., Ex Parte Louisville & Nashville Railroad Co.,* 398 So.2d 291 (Ala.1981); *Illinois Bell Telephone Co. v. Allphin,* 95 Ill.App.3d 115, 50 Ill.Dec. 739, 419 N.E.2d 1188 (1981). In those cases, the particular statutes explicitly restricted taxation to intrastate business and consequently precluded by their terms taxation of interstate business even though such taxation had been subsequently sanctioned by the *Brady* decision.[4] Here, the language imposing the tax is broad and does not contain a similar restriction.

Section 14–8 simply states that the tax shall not apply to transactions in interstate commerce which the United States Constitution prohibits the City from taxing. When construed together, Sections 14–2(a)(15) and 14–8 indicate a legislative expression of an intent to tax advertising to

---

4. After the Arizona Supreme Court's decision in *City of Phoenix v. Phoenix Newspapers, Inc.,* 100 Ariz. 189, 412 P.2d 693 (1966), it could have been urged that the ordinance in question did not apply to advertising revenues resulting from national advertising because it was intended to apply only to activities "within the City." However, several years prior to the times pertinent to this litigation, the ordinance was amended to make clear an intention on the City's part to impose the tax on advertising revenues "whether derived from the residents of the City or not, or whether derived from within the City or from without." *See Univar Corp. v. City of Phoenix,* 122 Ariz. 220, 594 P.2d 86 (1979).

the full extent permitted by the state and federal constitutions. In our opinion such language does not indicate a legislative intent to adopt as a part of the ordinance the case law interpretation of the commerce clause as it existed in 1949. Consequently, we do not agree with appellants' contention that the City's 1977 action in taxing those revenues constituted an attempt to expand the meaning of Section 14–2(a)(15) beyond its intended scope.

Since we have found that the imposition of the tax on national advertising revenues did not involve the imposition of an improper "new" tax, we need not consider in detail appellant's argument that the City was required to enact a new regulation pursuant to Section 14–44[5] of the city code. As we have previously stated, Section 14–2(a)(15) clearly subjected revenues generated by "advertising" to the privilege tax without distinguishing between "local" advertising and "national" advertising. This ordinance set the appropriate standard for taxation. The October 1977 letter did not establish a different or new standard requiring the promulgation of a new regulation pursuant to Section 14–44. Rather, it constituted an explanation or indication of how the existing standard was to be implemented. The letter was at the most a guideline authorized by the last paragraph of Section 14–44. Thus, we find that the City did not violate Section 14–44 when it began taxing national advertising revenues in 1977.

We therefore hold that from November 1, 1977 to December 19, 1978, the City property taxed revenues generated by national advertising. In arriving at this conclusion we have assumed that such a tax would have violated the commerce clause before the 1977 Supreme Court decision in *Brady, supra,* and have rejected appellants' contention that Section 14–8 adopted by reference the commerce clause as interpreted by case law at the time of adoption, not subject to change by subsequent decisional interpretation.

## SPOT RELIGIOUS ANNOUNCEMENTS

At the administrative hearing two general managers of religious broadcast stations described spot religious announcements as thirty or sixty second messages for religious organizations announcing religious services or special events, such as a revival or special speaker. Appellants argue that taxation of revenues generated by the sale of time for such announcements are not within the scope of advertising subject to the privilege tax.

Appellants contend that the language of Section 14–2(a)(15) limited the definition of advertising to that which appeals to "prospective purchasers." Section 14–2(a)(15) read as follows:

"Advertising by billboards, direct mail, radio, television, or by any means *calculated to appeal to prospective purchasers.*"

(Emphasis added).

5. Section 14–44 reads as follows:

"**Sec. 14–44. Rule making.**

"*The Collector shall prescribe the forms and procedures necessary to the administration of this Article and all returns shall be made upon such forms. Any rule or regulation interpreting the Ordinance shall be proposed by the Collector, and a copy thereof,* endorsed thereon to show the approval of the form and legality thereof by the City Attorney, shall be forwarded to the City Council for its approval at any regular or special meeting.

"It shall be the duty of the Collector to bring before the City Council such other rules and regulations as the Collector proposes for adoption. Except as provided above, in respect of rules and regulations concerning forms and procedures for administration of this Article, no rule or regulation shall be adopted unless and until approved by action of the Council, which is authorized to formulate rules and regulations to implement this Article.

"Upon application of taxpayers, the Collector is authorized to, but shall not be required to, issue advance ruling determinations as to the taxable nature of the transaction or transactions. The Collector is further authorized, in aid of taxpayers generally, to issue *guidelines or other statements* covering in general categories of taxpayers or transactions and the application of the Phoenix Privilege Tax and Phoenix Use Tax to such categories."

Appellants argue that the emphasized language implies that the privilege tax is imposed only upon advertising by the delineated means that is "calculated to appeal to prospective purchasers." They maintain that those listening to religious spot announcements are not "prospective purchasers," and thus, such announcements are not within the scope of the advertising which is subject to the City's privilege tax. We agree.

The only argument advanced in opposition to appellants' argument is that the phrase "calculated to appeal to prospective purchasers" does not refer to "advertising." Rather, it is urged that this phrase modifies only the manner or method used to express advertising. Thus, the argument is made that the phrase modifies the words "billboards," "direct mail," "radio," "television," and "means." This argument is illogical. These "means" of advertising could never, in and of themselves, without a message be "calculated to appeal to prospective purchasers." It is only the message (or advertising) communicated by the delineated means which could be "calculated to appeal to prospective purchasers."

In our opinion appellants correctly point out that "advertising" as defined in the City's code is limited to that which is directed at "prospective purchasers," such as offers for the sale of tangible goods or entertainment. We hold that messages announcing religious services or special events, such as a revival or special speaker, clearly do not fall within the code's advertising tax section as it existed in 1977.[6] Therefore the judgment in favor of the City on the issue involving spot religious announcements must be reversed.

## PRODUCTION REVENUES

Some of the appellant broadcasters are involved in filming commercials for advertising agencies. Typically the agency provides the concept, script, and any actors or props necessary to produce the commercial and then employs the filming services of the broadcaster at an hourly rate to film or tape the commercial. The advertising agency or its client, the sponsor, owns the finished product which may be broadcast on any or all of the appellant stations. The trial court found that transactions of this type constituted the sale of personal services and accordingly concluded that such transactions were not subject to the City's privilege tax imposed on the sale of tangible personal property pursuant to Section 14–2(a)(8).[7] The City has cross-appealed from this judgment, contending that the entire transaction of filming the commercial constitutes the sale of tangible personal property at retail. Thus, the City maintains, the gross receipts received by the broadcaster for filming the commercial are taxable.[8]

The City has cited numerous cases dealing with films and videotapes to support its position. We find these cases to be distinguishable. Some of the cases involved a sale or leasing arrangement in which the selling party owned the completed film or tape. The courts found the sale or rental transaction to be a taxable transfer of tangible personal property rather than a transfer of an intangible right to use the film or

---

6. In December 1978, the code was amended to eliminate the limitation "calculated to appeal to prospective purchasers." Therefore our opinion applies only to taxes imposed on appellants for revenues from spot religious announcements accruing during the period prior to the effective date of the December 1978 amendment.

7. Section 14–2(a)(8) (currently Section 14–2(a)(10)) imposed the privilege tax on persons engaged in the business of "selling any tangible personal property whatsoever at retail."

8. When the broadcaster supplies a blank tape to the advertising agency, the broadcaster pays a tax on the sale price of the blank tape. That amount is not at issue on this cross-appeal. Rather, this cross-appeal involves the taxability of other fees charged for producing the finished commercial on film or tape. In oral argument, counsel for the City indicated that when the advertiser supplies the tape, there is no transfer of tangible personal property and the transaction is not taxed.

tape.[9] Because the broadcasters in the case at bar do not own the completed commercial, these cases are factually distinguishable.

Other cases cited by the City are distinguishable because of differences in the applicable taxing ordinances. In *District of Columbia v. Norwood Studios, Inc.,* 336 F.2d 746 (D.C.Cir.1964), the court found that the production of a motion picture was subject to taxation as a sale of tangible personal property. The statutory definition of retail sale involved in that case, however, included "any production, fabrication, or printing of tangible personal property." 336 F.2d at 747. The applicable definition in the case at bar is not broad enough to include the production activities of the broadcasters. Under the city code, "sale" includes the "fabrication of tangible personal property for consumers who furnish either directly or indirectly the materials used in the fabrication work." The term "fabrication" suggests construction or manufacture. *See* Webster's New Collegiate Dictionary 405 (1979). We hold that the term "fabrication" can not apply to the limited filming activities involved here.

Other cases cited by the City have adopted a "true object" test to characterize a transaction.[10] Under such a test, if the buyer's objective is to obtain the end product of the skills or services, the transaction is a sale of tangible personal property. The applicable taxing ordinances here involved do not permit such an analysis of the buyer's purpose in entering the transaction.

Both Section 14–40(d) and Section 14–40(e) specifically allow a buyer to have a dual objective, seeking both the service and the property produced by the service.

Section 14–40(e) clearly provides an exemption for transfers of tangible personal property made in connection with services which are only inconsequential elements of the services rendered. This concept is reiterated in Section 14–42(b) [11] which also defines inconsequential as follows:

"The tangible personal property transferred incident to the transaction shall be regarded as inconsequential if,

"(1) the cost of the tangible personal property to the person rendering the services represents less than fifteen percent of the charge, billing or statement rendered to the purchaser in connection with the transaction, and

"(2) the tangible personal property transferred is not itself in a form which is subject to retail sale."

Thus, by its terms the ordinance provides a test for determining whether tangible property is inconsequential when entwined with the rendition of services.

Section 14–40(d) provides an exemption when the services and property can be separated even if the property is not an inconsequential element of the services according to the guidelines of Section 14–42(b). Under Section 14–42(a), the gross receipts derived from the services are not subject to the tax if (1) the services are separately

---

9. *See, e.g., Boswell v. Paramount Television Sales, Inc.,* 291 Ala. 490, 282 So.2d 892 (1973); *American Television Co. v. Hervey,* 253 Ark. 1010, 490 S.W.2d 796 (1973); *Florida Association of Broadcasters v. Kirk,* 264 So.2d 437 (Fla.App.1972); *Turner Communications v. Chilivis,* 239 Ga. 91, 236 S.E.2d 251 (1977); *Mount Mansfield Television, Inc. v. Vermont Commissioner of Taxes,* 133 Vt. 284, 336 A.2d 193 (1975); *see also Simplicity Pattern Co. v. State Board of Equalization,* 27 Cal.3d 900, 615 P.2d 555, 167 Cal.Rptr. 366 (1980) (court decided transfer of film negatives and master recordings constituted transfer of tangible personal property and further noted that transaction was a transfer of the assets of a going business rather than transfer of property incidental to a service performed by the transferor).

10. *See, e.g., Columbia Pictures Industries, Inc. v. Tax Commissioner,* 176 Conn. 604, 410 A.2d 457 (1979); *Houghton Mifflin Co. v. State Tax Commission,* 373 Mass. 772, 370 N.E.2d 441 (1977); *WTAR Radio-TV Corp. v. Commonwealth,* 217 Va. 877, 234 S.E.2d 245 (1977).

11. Section 14–42(b) reads in pertinent part:
   "(b) The gross income derived from the transfer of tangible personal property incident to services rendered directly to the purchaser, need not be reported to the Collector if the tangible personal property is inconsequential."

charged to the customers and (2) the charge for such services and the sales price of the property transferred are separately shown on the records of the taxpayer.[12]

Thus by their terms, Sections 14–42(a) and (b) delineate the tax treatment of a transaction involving the rendition of services and the transfer of tangible personal property. Therefore, it is not this court's prerogative to opt for the "true object" test applied by some jurisdictions.

■ The City characterizes the transaction as the sale of tangible property by focusing on the completed taped or filmed commercial. We believe the transaction should be characterized by analyzing the process involved. The broadcaster does not completely produce a commercial in the sense of originating the concept, preparing a script, and organizing any necessary actors or props. The broadcaster's only responsibility is to film the commercial. At the end of this process, the broadcaster does not own the commercial and has no right to sell, rent or otherwise dispose of the commercial. We therefore affirm the trial court's finding that these transactions do not constitute a sale of tangible personal property. Rather, they involve the sale of personal services not subject to the City's privilege tax.

The judgment of the trial court is reversed as to the imposition of the tax on spot religious announcements and affirmed in all other respects.

EUBANK and MEYERSON, JJ., concur.

---

12.  Section 14–42(a) reads as follows:

"(a) The gross income derived from services rendered directly to the purchaser are subject to the Privilege Tax if such services or labor rendered directly to or for the purchaser incident to the transaction:

"(1) are not separately charged to the purchaser, and

"(2) the charge for such services and labor and the sales price for the tangible personal property transferred are not separately shown on the books and records of the taxpayer."