## COMPTROLLER OF TREASURY *v.* THOMPSON TRAILER CORPORATION

[No. 133, October Term, 1955.]

492

*Decided April 6, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Edward F. Engelbert, Staff Attorney, Retail Sales Tax Division,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Stedman Prescott, Jr., Assistant Attorney General,* on the brief, for the appellant.

*H. Warren Buckler, Jr.,* and *William H. Gorman, II,* with whom were *Niles, Barton, Yost & Dankmeyer* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The Comptroller appeals from an order of the Circuit Court for Baltimore County directing him to cancel a use tax assessment and a sales tax assessment against Thompson Trailer Corporation, the appellee. The questions presented are three: (1) Is personal property manufactured in another State, and brought into Maryland by the manufacturer subject to the use tax? (2) Is personal property purchased for use in, and for years used in, another State subject to the use tax in Maryland when fortuitously and unexpectedly it is brought here for use? (3) Is the sale to Thompson by the Maryland Engineering Company of its plant and all its machinery and equipment therein a casual and isolated sale of the personal property, exempt from sales tax?

The testimony before the Comptroller showed the facts to be as follows. Thompson was incorporated in 1946 in Virginia and there began the manufacture of trailer and truck bodies in rented space at Bailey's Crossroads, Fairfax County. Its business grew and in 1949 it bought the plant it was renting. Then it obtained an Air Force contract and needed additional space urgently and immediately. It inspected available plants from Richmond to Boston, looking as far west as Pittsburgh. By chance it heard of a plant in Pikesville, inspected it and on February 1, 1951, bought it, with all its machinery and equipment, from its owners, Mr. and Mrs. William F. McBride, a partnership doing business as the Maryland Engineering Company. Thompson then moved its entire operation to Pikesville, bringing with it for use there a hydraulic press it had manufactured in Virginia, and machinery which it had purchased in Virginia, having a total original cost of $48,782.25. In the contract of sale Maryland Engineering Company bargained and sold to Thompson "* * * the following fee simple property * * * together with all the structures, sidings and improvements thereon and the chattels described in Exhibit 'A' attached hereto * * * At and for the price of Two Hundred and Fifty Thousand Dollars ($250,000.00) * * *." Exhibit "A" listed all of the tangible assets of Maryland Engineering Company, with the exception of raw materials, work in progress, and finished products. A subsequent appraisal assigned to the personal property bought by Thompson a value of $49,999.98 of the total purchase price. Mr. McBride testified that his reason for selling was to retire. He said: "I didn't even want to take a monkey-wrench or screwdriver, because I intended to quit. * * * I had no intention of going further into business of any kind." The Sales in Bulk Law was complied with. After the sale to Thompson, McBride completed the liquidation in 1951, disposing of the inventory on hand and completing a contract, half finished at the time of sale, for wooden cabinets for houses, making delivery as called for by the buyer as the houses were ready. He

did this only after he had offered the cabinet contract to a half dozen firms and found no takers. The McBrides' business was entirely woodworking—mainly making wooden doors for houses. Three or four months before the sale of the business, Maryland Engineering Company and a Mr. McConnel, trading as Southern Industries, of Randallstown, had bid on a Government contract for antennae masts, partly of metal and partly of wood, at a price of $368,000. The plan was for the Maryland Engineering Company to do the woodworking and to sub-contract the metal parts. Although it had been thought that some one else got the job, in May of 1951 the Government accepted the joint bid. Mr. McBride said that "When you bid on a Government contract, if they offer it to you, you take it or you pay the difference. This contract was $368,000, and the difference could have been very substantial. Mr. McConnel did not have the cash to handle the job, so I was duty-bound to get in and help him, and I did. * * * To save our own necks, because they would have bought from the next lower bidder, or any way they could get it, and charge us up with the difference." Mr. McBride rented space in Randallstown about the first of July and sometime in August began to do part of the metal work on the Government contract. Some of the details of, and difficulties in, the execution of the Government contract are related in *Velte v. McBride,* 208 Md. 434. After the sale to Thompson, Maryland Engineering Company reported monthly taxable sales to the Comptroller totalling $150,000—some $75,000 under the cabinet contract, $40,000 of inventory and $35,000, in the latter months, of metal sales under the Government contract. Mr. McBride testified that the capital resulting from the 1951 liquidation was divided between him and his wife, since they were partners, although there had not been a formal dissolution of partnership. They had been equal partners in business since 1931 and had engaged in half a dozen different kinds of business. The woodworking business had been started in 1942 and it was then that the name Maryland Engi-

neering Company was used for the first time. The metal working business, started in August, 1951, was a completely different operation from the woodworking business. None of the employees in the metal working business at the Randallstown plant had been employed at Pikesville, and none of them were woodcutting people, the two businesses being entirely different.

Our recent decision in *Comptroller of the Treasury v. American Can Company,* 208 Md. 203, which held that personal property manufactured without the State and brought in by the manufacturer is not subject to the use tax, disposes of the first question. Thompson need not pay the use tax on the value of the hydraulic press manufactured by it in Virginia and brought by it to Maryland.

The Comptroller contends that all tangible personal property is subject to the use tax when brought into Maryland, no matter how long this may be after purchase, and without regard to whether the purpose was to use it here, unless it is brought in for the purpose of resale. We think the language of the statute clearly discloses that the Legislature did not go this far. The imposition section of the use tax statute, Code, 1951, Art. 81, Sec. 369, provides that: "An excise tax is hereby levied and imposed on the use, storage or consumption in this State of tangible personal property purchased from a *vendor* within or without this State on or after the effective date of this Act. * * * The tax imposed by this section shall be paid by the *purchaser* and shall be computed as follows: * * * on * * * the price * * *." Sec. 368 (d) of Art. 81 defines "use" to be "the exercise by any person within this State of any right or power over tangible personal property purchased either within or without this State by a *purchaser* from a *vendor* * * *." Sec. 368 (c) defines a "purchaser" as any person "* * * who shall have *purchased* tangible personal property for *use, storage or other consumption* in this State upon which a tax is imposed under Sec. 369 * * *." Sec. 368 (b) defines a "vendor" as "every person engaging in the business of

*making sales* \* \* \* for *use, storage or consumption* within this State." (All emphasis supplied.) Sec. 373 (e) of Art. 81 requires a vendor to collect the use tax although the property is delivered directly to the purchaser outside of Maryland "if it is intended to be brought to this State for use, storage or consumption in this State."

As has often been noted—see, for example, *Comptroller of the Treasury v. Crofton Co.,* 198 Md. 398, and *Miller Brothers Co. v. Maryland,* 347 U. S. 340—the use tax is a complement to the sales tax, designed to prevent Maryland residents from purchasing in other States and avoiding the sales tax here, and injuring local merchants. The words of the statute lead us to conclude that the Legislature intended the use tax to be collected only when personal property was purchased with the intention of using it in Maryland. The definition sections clearly and explicitly say that the purchase must be for use within the State and spell out that the use which is taxed is that within the State of property purchased by one who intended to use it in the State. The imposition of the tax is upon the purchaser—by definition, one who had the intent at the time of purchase to use the property purchased within the State. Further evidence of the legislative will is found in the fact that the measure of the tax is the purchase price. Obviously, this normally would be the current value of the property purchased. It must be inferred that the law-makers contemplated that the article bought would be taxed at, or reasonably near, the time of purchase, for if this were not so, the depreciation in value which time usually brings, would result in the tax being measured by a value bearing little relation to reality. Under the Comptroller's contentions, an article brought into the State twenty years after it was bought would be taxed at cost price, although its actual value might well be but a fraction of cost. The Legislature has had no difficulty in clearly making taxable the use of property in the State, regardless of the place or time of purchase or the intent at that time. Code, 1951, Art. 66½, Sec. 28, imposes an excise tax on the issuance of

every certificate of title for a motor vehicle in the case
of sales or resales "at the rate of two percentum of the
fair market value". The section requires a disclosure
of the original price and other information relative to
current fair market value. (It is to be noted, too, that by
Chapter 332 of the Acts of 1955 the Legislature amended
the use tax statutes by deleting from the definition and
imposition sections the phrase "for use, storage or con-
sumption within this State". We express no opinion as
to the meaning of the statutes as amended since the case
before us is governed by the law in effect in 1951.)

The parties stipulated that at the time the machinery
and equipment sought to be subjected to the use tax were
purchased by Thompson in Virginia, "such items were
purchased with the intent of using them at the taxpayer's
plant in the State of Virginia, and said items were so
used." The evidence established the accuracy of the
stipulation and went further, to show clearly that there
was no intent at the time of any purchase to use the
property anywhere except in Virginia. There is lacking
in the case the element essential to the imposition of the
use tax, that is, the intent at the time of purchase to use
the property in Maryland. Absent this element, the
property is not subject to the use tax when it is unex-
pectedly brought into Maryland at a later date. This
reading of the statutes was foreshadowed in *Comptroller
of the Treasury v. American Can Company,* 208 Md.
203, to which we have referred. There the Comptroller
made the same contention that he does here—that
all property brought into the State is subject to the use
tax at the time it comes in, and the contention was re-
jected as to property manufactured out of the State and
then brought in by the manufacturer. Judge Henderson,
for the Court, noted that: "Nor does it follow that be-
cause the use tax is complementary to the sales tax it
must have a universal application. * * * It is not true,
as the Comptroller states, that 'all property which ulti-
mately finds its way into this State is subject to the use
tax with the exception of property held for sale * * *.'

The use tax, in its complementary function, requires both a purchase and a use." We add that it requires a purchase with intent to use in Maryland. The Comptroller, in the *American Can Co.* case, relied, as he does here, on Code, 1951, Art. 81, Sec. 379. This says that to prevent evasion of the tax "and the duty to pay the same as herein imposed", it shall be presumed that tangible personal property sold for delivery in this State is for use, storage or consumption in this State, and that a like presumption shall apply as to tangible personal property delivered without the State and brought into the State by the purchaser. The presumption is rebuttable if the purchaser holds a resale certificate issued by the Comptroller. It was held in the *American Can Co.* case that Sec. 379 did not override the meaning of the statute, made plain by its other provisions, dealing as it does with deliveries. We think that Sec. 379 does no more than aid the Comptroller in enforcement by the presumption that property brought into the State is not within the exemption from tax given property bought for resale. It is conceded that Thompson brought the machinery and equipment into Maryland for use and not for resale. In any event since we hold that the statute imposes no tax on that use, it follows Thompson is not evading or attempting to evade a tax "and the duty to pay the same as herein imposed", and the purpose of the section is not reached.

Other Courts hold as we have held on this aspect of the case. In *Morrison-Knudsen Co. v. State Tax Commission,* 44 N. W. 2d 449, the Supreme Court of Iowa, by a five to four decision, found that the use tax of that State did not apply to equipment of a railroad contractor purchased during the preceding eight years and used elsewhere, and then brought into Iowa to complete a construction job for a railroad. The Court found that the words of the Iowa statute imposing an excise tax on property purchased "for use in this State" were deliberately employed to require the presence of intention at the time of purchase to use the personal property in the State. It found no evil against the purpose of the Iowa statute or against

Iowa dealers because a non-resident could purchase property in a remote State for use there and pay no tax when he brought it by chance to Iowa. The highest Court of New Mexico followed the *Morrison-Knudsen* case in *Rowan Drilling Co., Inc. v. Bureau of Revenue*, 288 P. 2d 671. The Comptroller relies on language in *Southern Pacific Co. v. Utah State Tax Commission* (Utah), 150 P. 2d 110. There the Court held that the commerce clause of the Federal Constitution prevented the imposition of the Utah use tax on meals furnished in the State to dining car crews on through trains, made up of food supplies purchased in other States. The Court indicated that if it were not for this constitutional barrier the tax would be payable. This statement, relied on by the Comptroller, may well have been dictum but if not, the Court seemingly assumed that there was a general intent at the time of purchase to use in Utah as much of the supplies as were actually there used for meals. The dissenting opinion in the Iowa case of *Morrison-Knudsen Co., supra,* also was based on the ground that a contractor who works regularly in many States has a general intention to use property purchased where it is later taken to be used. Even under the views of the minority, they would have agreed with the majority of the Iowa Court under the facts of the case before us. A finding of this same general intent underlay the opinion in 36 *Opinions of the Attorney General* 298, which the Comptroller relies on as evidence of the administrative practice in support of his views. There it was held that the use tax was applicable to equipment brought into Maryland by an out-of-state contractor, who for some years had regularly built roads in Maryland, some of whose equipment had been purchased after he had begun work on Maryland contracts. In the case before us, there was no intent whatever at the time of purchase to use in Maryland the property purchased, and the lower court was right in abating the use tax assessment.

In holding Thompson liable for the sales tax on the property it bought from Maryland Engineering Com-

pany, the Comptroller made this finding: "I therefore, find that the sale to Thompson Trailer Corporation did not amount to a complete dissolution of the business of the Maryland Engineering Company and the assessment must therefore stand as made." The Comptroller makes two contentions: first, that this was a finding of fact that the court could not overturn, and that if the court did have the power to make a finding on the point, there was not a complete liquidation of the Maryland Engineering Company. We think that the matter of whether the sale was casual and isolated is at least a mixed question of law and fact, one properly to be reviewed by the Court. *Comptroller of the Treasury v. Smith*, 205 Md. 408; *Mitchell v. Md. Employment Security Board*, 209 Md. 237.

The Comptroller pleads earnestly that the sale was not a casual and isolated sale either within the exemption of Code, 1951, Art. 81, Sec. 322 (e), or the terms of the Comptroller's Rule 39, which provides in the pertinent part that "Sales of fixtures and equipment in conjunction with a complete liquidation of a person's business are considered casual and isolated sales." The Comptroller relies heavily on the fact that the partnership known as the Maryland Engineering Company did not formally dissolve until several years after the sale, on the fact that after the sale it sold its inventory on hand and completed the contract for the cabinets, and on its entry into the metal working business. At first blush these facts seem to lend support to the Comptroller's position but we have decided, after careful consideration, that the position is unsound. Sec. 322 (e) of Art. 81 provides that "The tax hereby levied shall not apply to the following sales: * * * (e) Casual and isolated sales by a vendor who is not regularly engaged in the business of selling tangible personal property." Sec. 320 (k) of Art. 81 gives this definition: " 'Engaging in business' means commencing, conducting, or continuing in business, as well as liquidating a business when the liquidator thereof holds himself out to the public as conducting such a business." Sec. 363 of Art. 81 provides that "When any person is engaged

in two or more forms of business in which sales at retail taxable under the provisions of this sub-title are made, such person may, upon the consent of the Comptroller, file a consolidated return covering all of his business activities." By a fair reading of Sec. 320 (k), one is not engaging in business when he is liquidating, unless he holds himself out to the public as conducting the business. An illustration of this would be a retail merchant who advertises to the public that he is selling his stock of merchandise at reduced prices in liquidation of his business. Maryland Engineering Company did not hold itself out to the public as liquidating its business, and neither solicited nor took new woodworking business, merely selling its stock on hand and completing a contract. The sale was by one not regularly engaged in business within the meaning of the statute since the seller was in liquidation. Was the sale casual and isolated? It was not a case of replacing worn or obsolete machinery by new machinery to continue production. It was a sale clearly not in the ordinary course of the business of the Maryland Engineering Company, one never to be repeated. We think that the sale was casual and isolated and exempt under the statute. The Comptroller's rule would seem to extend the requirements of the statute somewhat, but nevertheless, the sale seems to meet the requirements of the rule that the sale be "in conjunction with a complete liquidation of a person's business." Under the definitions of the statute—Sec. 320 (a) of Art. 81—a person is any business entity. The statute recognizes also, as we have noted, that a person may engage in two or more distinct businesses. A liquidation is generally defined as the winding up of a business or enterprise. The Court of Appeals of New York, in *Lafayette Trust Co. v. Beggs*, 213 N. Y. 280, 107 N. E. 644, 645, reiterates a classic definition of liquidation found in many cases. It said: "The word 'liquidation' is synonymous with 'winding up or settlement with creditors.' In its general sense, it means 'the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its

debtors and creditors, and appropriating the amount of profit or loss.'" There is no doubt that Mr. and Mrs. McBride sold all of the assets of the Maryland Engineering Company, paid all of the creditors and appropriated the cash remaining. The majority of the assets were sold to Thompson. The rest of the assets, the inventory on hand and the cabinets were sold to others. The Sales-in-Bulk Act procedure was followed and all creditors were paid. The capital resulting from the liquidation was divided between Mr. McBride and his wife. All of the elements of a complete liquidation of the only business of Maryland Engineering Company, the woodworking business, are to be found. This was a complete liquidation of "a person's business" and the sale to Thompson was "in conjunction with it." In a case where the taxable entity was engaged in more than one business, the sale of an integrated steel business owned by it was held to be exempt from sales tax in *Geneva Steel Co. v. State Tax Commission* (Utah), 209 P. 2d 208. The effect of the liquidation of the woodworking business is not to be nullified because the cash which resulted was re-employed in the metal business by reason of contract obligations that could not be avoided except at a substantial financial loss. We find that the sale to Thompson by Maryland Engineering Company was in conjunction with a complete liquidation of the only business of Maryland Engineering Company at the time of the sale and, therefore, exempt under the rule.

In *Chesapeake Marine Railway Co. v. Lacy*, in the Baltimore City Court, January 23, 1951, (see CCH Maryland Tax Service, Par. 60-220), Judge Tucker reached the same conclusion under similar facts. There, Willis-Spedden Shipyard, Inc., which was engaged in the ship repair and ship building business, sold to Chesapeake Marine Railway Co. its real estate and all its machinery, tools and office equipment, except one milling machine, a motor vehicle and some floating launches. Excluded from the sale also was the name of the vendor, the good-will, the cash, the accounts receivable and the inventory of raw

materials. The Willis-Spedden corporation went into suspended animation, so to speak, but at the time of the sale had not been dissolved. Judge Tucker noted in his opinion that on September 11, 1947 an Assistant Attorney General had advised the Comptroller's office by letter that the sale of fixtures and depreciable tangible personal property, included in the sale of an entire business, was a casual and isolated sale and quoted the language of the letter that " 'While it may be true that a merchant is regularly engaged in selling tangible personal property, it does not necessarily follow that he is thus engaged in selling all property owned by him. In my opinion, this latter category would include fixtures and depreciable tangible personal property. For this reason, the sale of such property in connection with the sale of an entire business would be a casual or isolated sale and not subject to the sales tax.' " Judge Tucker, in holding the sale exempt, did not rest the decision on this reasoning but rather on the statute. The Comptroller acquiesced in this decision, or at least did not appeal it to this Court, and since the decision, the Legislature has not seen fit to change its result.

The Supreme Court of Utah, in *Geneva Steel Co. v. State Tax Commission,* 209 P. 2d 208, referred to above, held that the War Assets Administration and the Reconstruction Finance Corporation, in making sale of an integrated business, a steel plant in Utah, including inventory and personal property, to a steel company, was making an "isolated and occasional sale" exempt from tax. It was a regular practice of the War Assets Administration and the Reconstruction Finance Corporation in selling surplus property in Utah, as they regularly did, to collect from the purchasers the sales and use tax. The Court, in a careful opinion, quoted and considered the regulations of several States as to isolated and non-recurring sales and said: "Thus ordinarily when a person sells his entire business outright to a single purchaser, the sale is isolated or occasional since the regular course of his business is not selling businesses." The Court concluded:

"* * * the Legislature did not intend to tax the sale of personal property transferred as a component part of the sale of an integrated business." We think that the philosophy implicit in the quoted language was written in by the Maryland Legislature as an exemption in the sales tax statute and by the Comptroller in his Rule 39, and that on this record, a business as such was sold in liquidation, the sale to Thompson being the major step, and that, therefore, the lower court did not err in abating the assessment of the sales tax sought to be collected.

*Order affirmed, with costs.*