822 P.2d 498

**TUCSON ELECTRIC POWER COMPANY, Plaintiff–Appellant,**

v.

**ARIZONA DEPARTMENT OF REVENUE, Defendant–Appellee.**

No. 1 CA–TX 91–005.

Court of Appeals of Arizona, Division 1, Department T.

Dec. 12, 1991.

Twitty, Sievwright & Mills by N. Douglas Grimwood, Phoenix, for plaintiff-appellant.

Grant Woods, Atty. Gen. by Sandra B. Kelley, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

CONTRERAS, Judge.

Tucson Electric Power Company (Tucson Electric) has appealed from a tax court judgment that sustained a decision of the Arizona Board of Tax Appeals in favor of the Arizona Department of Revenue (the Department) on Tucson Electric's bid for reduction of certain transaction privilege tax assessments for the period from July of 1983 through July of 1985. The appeal raises the following issues for our consideration:

(1) Were minimum demand charges paid by Cyprus Pima Mining Company under its electric service agreement with Tucson Electric taxable to Tucson Electric as gross receipts or gross income from the business of "producing and furnishing ... electricity" within the meaning of former A.R.S. section 42–1310(2)(b)?

(2) If the minimum demand charges are determined to be taxable, must application of the tax be prospective only?

(3) Were the minimum demand charges exempt from taxation as income from sales of warranty or service contracts pursuant to A.R.S. section 42–1310.-01(A)(3)?

(4) Were the minimum demand charges nontaxable as constituting payments in settlement of a disputed claim?

We have jurisdiction pursuant to A.R.S. section 12–2101(B). The appeal was assigned to Department T of this court pursuant to A.R.S. sections 12–120.04 and 12–170(C).

## FACTUAL AND PROCEDURAL HISTORY

The essential facts are undisputed. At all times material to this litigation, Tucson Electric was an Arizona public utility in the business of supplying electric power to various customers. Tucson Electric entered into an electric service agreement with Cyprus Pima Mining Company (Pima) on July 23, 1979, under which Tucson Electric undertook to supply electricity up to a specified maximum demand for the operation of the Pima Mine. Pima and Tucson Electric agreed that Pima would pay for all electric service furnished by Tucson Electric in accordance with Tucson Electric's established Optional Large Light and Power Rate No. 14, except as modified in the agreement.[1]

The parties modified the standard provisions of Optional Large Light and Power Rate No. 14 by agreeing that Pima would pay Tucson Electric for specified minimum amounts of electricity each month even if its actual use was less. Throughout this decision the parties' agreement will be referred to as the "electric service agreement." By the terms of this electric service agreement, the minimum monthly demand was to be 8 megawatts through June 30, 1980, 18 megawatts from July 1, 1980, through June 30, 1982, and 30 megawatts from July 1, 1982, through the expiration of the electric service agreement on July 22, 1987. The minimum demand charge at the 30–megawatt level was $200,000.00 per month.

In 1983, Pima sued Tucson Electric to contest the validity of the electric service agreement. In June of 1984, after extensive negotiations, the parties reached a set-

---

**1.** Optional Large Light and Power Rate No. 14 was a published set of standard terms and rates filed with the Arizona Corporation Commission and effective for billings on and after August 4, 1976.

tlement under which the electric service agreement was modified to advance its expiration date from July 22, 1987, to June 30, 1985. The agreement required Pima to continue paying the $200,000.00 monthly minimum demand charge until the payments totalled $5,000,000.00.

During the term of the electric service agreement, Tucson Electric collected a percentage of the total charges from Pima as transaction privilege taxes—four percent through December of 1983 and five percent through June 30, 1985. On November 3, 1986, Tucson Electric filed with the Department a claim for a refund of approximately $250,000.00 in transaction privilege taxes paid from July of 1983 through July of 1985 on Pima's minimum demand charge payments. The Department's sales and use tax section denied the claim, and Tucson Electric protested this denial.

After an administrative hearing, the Department's hearing officer sustained Tucson Electric's protest to the extent of transaction privilege taxes paid on amounts in excess of the cost of electricity actually furnished. The sales and use tax section appealed to the Department's director, who overruled the hearing officer's decision. Tucson Electric then appealed the director's final order to Division Two of the State Board of Tax Appeals. The board affirmed.

Pursuant to A.R.S. section 42–124(B)(2), Tucson Electric commenced this action against the Department. On cross-motions for summary judgment, the tax court ruled in the Department's favor, reasoning in part as follows:

As a part of the agreement between the taxpayer and Cypress Pima Mining Company, a minimum payment was to be made in the event the mine's use of electricity fell below a wattage designated in the agreement. The taxpayer was also committed to supply a maximum wattage if the mine needed it. The taxpayer justifies charging for a minimum demand because, in order to supply the anticipated electrical needs of the mine, the utility had to make certain capital expenditures, the recovery of which had to come from the sale of electricity to the mine.

During the early years of the contract period, the Pima Mine used enough electricity so that the minimum charge was never a factor. However, in 1982, or thereabouts, the mine shut down and electrical use dropped down way below the minimum demand. This circumstance remained in effect for the years 1983 through 1985, the period in issue here.

Cyprus Pima Mining Company paid, and the taxpayer remitted to the Department of Revenue, a transaction privilege tax measured by the minimum demand charge incurred by the mine pursuant to its owners' agreement with the taxpayer.

The taxpayer now seeks a refund of those taxes, claiming that the minimum charge was not revenue received by the taxpayer for furnishing electricity.

With this the Court disagrees. The ordinary rate for electricity contemplates reimbursement to the utility of its expenses expended plus a reasonable profit. Expenses includes the cost of its capital expenditures amortized over the useful life of the capital goods utilized.

A pricing agreement which includes a minimum charge such as exists here is nothing more than a provision for an increase in the unit cost of electricity if a minimum number of units are not purchased. These revenues are just as much a part of the utility's gross revenue from producing electricity as are revenues obtained at a price-per-kilowatt hour.

As it turned out, Cyprus Pima Mining Company challenged the taxpayer's right to charge the high minimum demands which it was charging. Litigation ensued which was resolved by settlement. The taxpayer now argues that the payments it received subsequent to the settlement, and pursuant to settlement, were the equivalent of liquidated damages. Again, the Court disagrees. The Court still is of the view that these payments are payments received for the purchase of electricity, even at the very high per-unit rates.

The tax court entered formal judgment in accordance with its ruling. This timely appeal followed.

## WERE THE MINIMUM DEMAND CHARGE PAYMENTS TAXABLE TO TUCSON ELECTRIC AS GROSS PROCEEDS OF SALES OR GROSS INCOME FROM THE BUSINESS OF PRODUCING AND FURNISHING ELECTRICITY?

■ Tucson Electric contends on appeal that it was liable for transaction privilege taxes only on amounts received from Pima as the sales price of electricity actually furnished. It argues that to the extent its minimum demand charge receipts did not represent actual sales of electricity, they constituted income from "incidental or extraneous activities" that were not subject to taxation. Tucson Electric argues that "it is only the 'furnishing' or 'sale' of electricity which is subject to the tax, and not the demand charge to be paid in the event that no sale takes place. This extraneous matter is outside the permissible scope of the statute and is not taxable under A.R.S. § 42–1310(2)(b)." We disagree.

Former A.R.S. section 42–1309(A) levied "privilege taxes measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the schedule as set forth in § [ ] 42–1310." Former A.R.S. section 42–1310 provided in part:

The tax imposed by § 42–1309, subsection A shall be levied and collected at the following rates:

. . . .

2. At an amount equal to one percent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the following businesses:

. . . .

(b) Producing and furnishing, or furnishing to consumers, electricity, electric lights, current, power or gas, natural or artificial, and water. . . .

*See also* former A.R.S. §§ 42–1361 and 42–1371.

At the same time, former A.R.S. section 42–1312(A) imposed a transaction privilege tax of "two percent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the business of selling any tangible personal property whatever at retail," with certain specific exceptions. Former A.R.S. section 42–1301 provided in pertinent part:

In this article, article 1.1, article 1.2 and article 1.3 of this chapter, unless the context otherwise requires:

. . . .

2. "Business" includes all activities or acts, personal or corporate, engaged in or caused to be engaged in or caused to be engaged in with the object of gain, benefit or advantage, either directly or indirectly, but not casual activities or sales.

. . . .

7. "Gross income" means the gross receipts of a taxpayer derived from trade, business, commerce or sales and the value proceeding or accruing from the sale of tangible personal property, or service, or both, and without any deduction on account of losses.

8. "Gross proceeds of sales" means the value proceeding or accruing from the sale of tangible personal property without any deduction on account of the cost of property sold, expenses of any kind, or losses, but cash discounts allowed and taken on sales shall not be included as gross income.

. . . .

10. "Gross receipts" means the total amount of the sale, lease or rental price, as the case may be, of the retail sales of retailers, including any services that are part of the sales, valued in money, whether received in money or otherwise, including all receipts, cash, credits and property of every kind or nature, and any amount for which credit is allowed by the seller to the purchaser without any deduction therefrom on account of the cost of the property sold, materials

used, labor or service performed, interest paid, losses or any other expense, but does not include cash discounts allowed and taken nor the sale price of property returned by customers when the full sale price thereof is refunded either in cash or by credit.

....

19. "Sale" means any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatever, of tangible personal property, for a consideration....

....

21. "Tangible personal property" means personal property which may be seen, weighed, measured, felt, touched or is in any other manner perceptible to the senses.

As the statutes indicate, Tucson Electric's transaction privilege tax liability for the period in question extended to all its "gross proceeds of sales *or* gross income" from engaging in the business of "producing and furnishing ... electricity." Former A.R.S. § 42–1310(2)(b) (emphasis added). As defined by former A.R.S. section 42–1301(7), "gross income" includes not only gross receipts from sales, but also "the value proceeding or accruing from the sale of tangible personal property, or service, or both." Accordingly, if the business of "producing and furnishing ... electricity" includes a service component for which the taxpayer is compensated, then those amounts were fully taxable to Tucson Electric under former A.R.S. section 42–1310(2)(b). *Cf.* A.R.S. § 42–1329 (all gross proceeds of sales and gross income from taxable business activity are presumed part of business' tax base until contrary is established).

Tucson Electric's insistence that the business of "producing and furnishing ... electricity" amounts to no more than selling electricity as a commodity squares neither with the statutory scheme nor with the record. Electricity is personal property that may be measured; it thus constitutes "tangible personal property" within former A.R.S. section 42–1301(21). If the business of "producing and furnishing ... electricity" were no more than the business of selling electricity for use by consumers, the income from it would be fully taxable as income from the business of selling tangible personal property at retail within former A.R.S. section 42–1312(A), and the separate imposition by A.R.S. section 42–1310(2)(b) of a tax on income from the business of "producing and furnishing ... electricity" would be superfluous.

To the contrary, however, the business of "producing and furnishing ... electricity" logically includes not only the actual selling of electricity as a commodity, but also providing the numerous continuing services necessary to deliver the electricity to the customer reliably and in a useful form. This observation is not only intuitively plain, but also accurately describes the commercial relationship between Pima and Tucson Electric.

Tucson Electric agreed not only to "supply the total electric power and energy requirements of the Customer for its overall operations at the Pima Mine up to the capability of the Company's installed facilities," but also to provide to Pima the following services: (1) "to operate and maintain the facilities required to furnish service" to the points of delivery; (2) "to provide service consistent with modern engineering practices in the operation of steam power plants, transmission lines, and distribution lines and to endeavor to deliver electric power and energy as nearly continuous as practicable twenty-four (24) hours each day"; (3) to "permit use of available space on Company's pole line facilities for (a) installation of one control circuit between the Customer's mill location and Customer's water pump station location, and (b) installation of distribution and control circuits on Company's pole line facilities located on Customer's property at the mine and mill location"; (4) to furnish, install, maintain and calibrate suitable metering equipment of standard manufacture at the Company's expense; and (5) to read the meters monthly and render monthly statements of account.

In our opinion, these services were just as much a part of Tucson Electric's business of "producing and furnishing ... elec-

tricity" as its actual sales of electricity. Further, it would strain credulity to posit that the relationship between Tucson Electric and its customers was such that it was paid only for the electricity that it sold and not for any of the auxiliary services that it rendered. We conclude that all of the income received by Tucson Electric under its electric service agreement with Pima, including all minimum demand charge payments, constituted "gross income" from the business of "producing and furnishing ... electricity" and was fully taxable as such under former A.R.S. section 42–1310(2)(b).

The Arizona decisions on which Tucson Electric places its primary reliance are all inapposite. *Ebasco Services, Inc. v. Arizona State Tax Commission*, 105 Ariz. 94, 459 P.2d 719 (1969), and *State Tax Commission v. Holmes & Narver, Inc.*, 113 Ariz. 165, 548 P.2d 1162 (1976), concerned taxpayers that engaged both in construction services and in design and engineering services. In both cases, our supreme court held that design and engineering services did not fall within any of the statutory categories that would ordinarily identify one as engaging in the taxable business of contracting. *See* former A.R.S. § 42–1310(2)(i). In contrast, the array of services that Tucson Electric provided to Pima in connection with its sales of electricity was clearly part of its business of "furnishing" electricity.

*Dennis Development Company v. Department of Revenue*, 122 Ariz. 465, 595 P.2d 1010 (App.1979), which held that a contractor's sales receipts attributable to the cost of land upon which it built residences did not constitute income from contracting, is distinguishable for the same reasons as *Ebasco Services* and *Holmes & Narver.* Finally, to the extent that *Trico Electric Cooperative v. State Tax Commission*, 79 Ariz. 293, 288 P.2d 782 (1955), is relevant here, it actually supports the Department's position. There the court stated:

> If activities are incidental in the sense that they are inseparable from the principal business and interwoven in the operation thereof to the extent that they are in effect an essential part of the business, they cannot be taxed as a separate business.

79 Ariz. at 297, 288 P.2d at 784. The package of services provided Pima by Tucson Electric was an integral part of the process by which it "furnished" electricity for compensation.

## MUST APPLICATION OF THE TAX ON "PRODUCING AND FURNISHING ... ELECTRICITY" TO TUCSON ELECTRIC'S MINIMUM DEMAND CHARGE RECEIPTS BE PROSPECTIVE ONLY?

■ Tucson Electric argues that if its minimum demand charge receipts from Pima are now determined to be taxable, they may be taxed prospectively only, because such receipts have never been taxed before. For several reasons we disagree.

First, the decisions on which Tucson Electric relies stand only for the proposition that the court may, as a matter of fairness, choose to give only prospective application to a holding that overrules an earlier decision. *See, e.g., Arizona State Tax Comm'n v. Ensign*, 75 Ariz. 220, 254 P.2d 1029, *on reh'g*, 75 Ariz. 376, 257 P.2d 392 (1953); *Duhame v. State Tax Comm'n*, 65 Ariz. 268, 179 P.2d 252 (1947). In this case, however, Tucson Electric cannot claim to have relied on any holding by an Arizona court to the effect that revenues from minimum demand charges are nontaxable. As we have stated:

> [E]ven where there is a clear administrative practice of applying the taxing statutes in a certain manner, that practice does not mandate continued adherence where the taxing statute is clear and requires a different result.

*Arizona Lotus Corp. v. City of Phoenix*, 136 Ariz. 22, 24, 663 P.2d 1013, 1015 (App. 1983) (citations omitted). We are aware of no legal or equitable reason that would entitle Tucson Electric to a refund of the sums that it paid under protest in this case.

## WERE TUCSON ELECTRIC'S MINIMUM DEMAND CHARGE RECEIPTS EXEMPT FROM TAXATION UNDER A.R.S. SECTION 42–1310.01(A)(3)?

■ Current A.R.S. section 42–1310.01, added by 1988 Arizona Session Laws, chap-

ter 161, section 4, became effective July 1, 1989. Subsection (A)(3) of that statute, on which Tucson Electric relies, had not yet been enacted during the taxable periods to which this appeal relates.

The predecessor of current A.R.S. section 42–1310.01 was former A.R.S. section 42–1312. Subsection (A) of that section provided in pertinent part:

> The tax imposed by subsection A of § 42–1309 shall be levied and collected at an amount equal to two percent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the business of selling any tangible personal property whatever at retail, but the tax shall not apply to the gross proceeds of sales or gross income from:
>
> . . . .
>
> 4. The sale of a warranty or service contract with term factor cost of four hundred dollars or less, which entitles the purchaser to both goods and services as prescribed by the conditions of such a contract.

Tucson Electric urges at some length that its minimum demand charge receipts from Pima amounted to compensation for a warranty of continuous electrical service and were therefore exempt under this statute. The short answer to this argument is that the warranty or service contract exemption under section 42–1312(A)(4) pertained only to the transaction privilege tax on the business of selling tangible personal property at retail. The tax for which Tucson Electric was liable was that imposed on the business of "producing and furnishing ... electricity," for which no similar exemption was available.

## WERE TUCSON ELECTRIC'S MINIMUM DEMAND CHARGE RECEIPTS NONTAXABLE AS PAYMENTS FOR SETTLEMENT OF A DISPUTED CLAIM?

As stated above, Pima sued Tucson Electric, challenging the validity of its mini-

mum demand charges. That dispute was settled pursuant to an agreement that required Pima to continue to pay the agreed minimum demand charges, but for a shorter period of time. Tucson Electric now argues, without citing authority, that by virtue of the settlement, Pima's continuing payments ceased to constitute gross income from the business of producing and furnishing electricity and became instead payments of liquidated sums in settlement of a lawsuit. We disagree.

The parties' settlement agreement of June 19, 1984, did not nullify or replace their electric service agreement of July 23, 1979, but merely amended it. Although the duration of Pima's minimum demand charge payments was shortened, the source of its obligation to make them remained the parties' electric service agreement. That agreement, as modified, continued to define and govern Tucson Electric's commercial relationship with Pima in the business of producing and furnishing electricity. In our opinion, the modification of the electric service agreement did not effect a change in the character of Tucson Electric's minimum demand charge receipts. These receipts remained gross income from the business of producing and furnishing electricity.

Affirmed.

EHRLICH, P.J., and SHELLEY, J., concur.

Note: The Honorable MELVYN T. SHELLEY, a retired judge of the Arizona Court of Appeals, was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Article 6, section 20 of the Arizona Constitution and A.R.S. section 38–813.