925 P.2d 680

PCS, INC., a Delaware corporation,
Plaintiff–Appellant,

v.

ARIZONA DEPARTMENT OF REV-
ENUE, an agency of the State of
Arizona, Defendant–Appellee.

No. 1 CA–TX 94–0006.

Court of Appeals of Arizona,
Division 1, Department T.

Dec. 29, 1995.

Review Denied Oct. 21, 1996.*

Lewis and Roca by John P. Frank, Patrick Derdenger and Anthony Blackwell, Phoenix, for Plaintiff–Appellant.

Grant Woods, Attorney General by James M. Susa, Assistant Attorney General, and Joseph A. Kanefield, Assistant Attorney General, Phoenix, for Defendant–Appellee.

## OPINION

KLEINSCHMIDT, Judge.

The taxpayer, PCS, Inc., appeals from summary judgment for the Arizona Department of Revenue on PCS's claim for a refund of use taxes which it paid under protest. The tax was assessed on certain plastic cards PCS uses in its business. We believe the cards were subject to the tax, and accordingly, we affirm.

### FACTS AND PROCEDURE
### IN THE TAX COURT

PCS is in the business of providing a service to various insurance plans. The service permits pharmacies to determine by computer whether a customer is covered by insurance that will pay for the customer's drug purchases. If coverage exists, the system also pays the pharmacy for the purchases immediately and then bills the payment to the customer's insurance plan.

PCS issues identification cards encoded with eligibility and other information about

* Feldman, C.J., and Jones, J., of the Supreme Court, voted to grant the Petition for review.

each individual beneficiary. These are given to the beneficiaries, and, when the beneficiaries want to purchase drugs, the cards are "swiped" through a participating pharmacy's card reader which transmits the necessary information to PCS for action on the customer's claim.

PCS makes plan identification cards in Arizona to the order of its clients. PCS purchases blank cards from out-of-state vendors. The cards have blank magnetic data strips and may carry printing or legends specific to the plan in question. Because these purchases take place in interstate commerce, no Arizona transaction privilege tax is imposed on the non-Arizona retail seller or passed on to PCS.

At its offices in Scottsdale, Arizona, PCS accumulates data about each beneficiary of its clients and enters the data onto magnetic tapes. These tapes are then used on machines that feed the blank cards purchased by PCS into a mechanical heat process that punches each beneficiary's name and other personal information onto each card in raised letters and encodes information onto the magnetic data strip on the card. After quality checking, the finished cards are shipped in bulk to the plan sponsor or mailed directly to the beneficiaries themselves. Most of the finished cards are sent to plan sponsors outside of Arizona, but some go to plan sponsors in Arizona. Only those cards which are shipped outside of Arizona are at issue in this case.

At any one time, PCS may own as many as 14 million blank cards. Three to 4 million of these will be entirely blank cards in inventory in Arizona, and 4 million will be unprocessed sponsor-specific cards for various active plan sponsors, also on hand in Arizona. The remainder will be held by out-of-state card vendors or overflow processors.

PCS includes a fee for the initial issuance of cards in its base processing charges to its clients. It also makes separate charges for specialized art work related to the production of cards and for reissuance of cards more frequently than normal.

Once PCS has processed and distributed the cards, it has nothing more to do with them. When a beneficiary becomes ineligible, his or her card is canceled electronically.

In 1983, following an audit, the Department decided the cards should be taxed. PCS protested, and, at an informal conference in June 1983, representatives of the Department and the Arizona Attorney General's Office acquiesced in that view. Between 1983 and 1990, PCS relied on the Department's agreement that no tax would be imposed on the cards.

In 1990, the Department changed its position and issued a use tax assessment for all cards provided to out-of-state plan sponsors for the period of January 1, 1986 through January 31, 1990. The Department's appeals section abated any penalties for late filing and payment, but rejected PCS's contention that the cards were not subject to the use tax. The Board of Tax Appeals, Division Two, affirmed. After paying the use tax and interest under protest, PCS brought this action for a refund in the tax court.[1]

On cross-motions for summary judgment, the tax court ruled for the Department in a published opinion. *PCS, Inc. v. Arizona Dep't of Revenue*, 176 Ariz. 628, 863 P.2d 920 (Tax Ct.1993). PCS appealed.

### THE PLASTIC CARDS USED OUTSIDE ARIZONA ARE SUBJECT TO THE USE TAX

■ Arizona Revised Statutes Annotated ("A.R.S.") section 42–1408(A) imposes "an excise tax on the storage, use or consumption in this state of tangible personal property purchased from a retailer, as a percentage of the sales price." The tax rate is the same as would apply to retailers under the Arizona transaction privilege (sales) tax on the business of selling tangible personal property at retail. *See* A.R.S. § 42–1408(C). If the gross receipts from the sale are included in the measure of the Arizona transaction privilege tax, such property is exempt from the

---

1. The legislature enacted 1994 Sess.Laws. Ch. 305 § 1, which amended A.R.S. § 42–1409(A) by adding a new subsection 35, now renumbered subsection 39, which exempts these cards from taxation. The legislation is prospective only.

use tax. So is tangible personal property which has already been subjected to another state's sales or use tax equal to or exceeding the Arizona transaction privilege tax. A.R.S. § 42–1409(A)(1) and (2). As the tax court generally noted in *People of Faith v. Arizona Dep't of Revenue,* 161 Ariz. 514, 779 P.2d 829 (Tax Ct.1989), *appeal dismissed,* 164 Ariz. 102, 791 P.2d 369 (App.1990):

> Typically, sales taxes and use taxes are complementary. [Citations omitted.] Both taxes start with a retail sale. The sales tax is a transaction tax on the sale. It is imposed upon the seller but ordinarily is passed through to the buyer. The use tax is a tax on the privilege of using the purchased property within the state and is imposed on the buyer. Both taxes are computed by multiplying the sale price by the tax rate. To be truly complementary, both taxes should be at the same rate. If the sale was subject to sales tax, the buyer is exempt from use tax. . . .
>
> If the foregoing scheme works as it is designed to work, the buyer (the real payer of the sales tax, whether passed through or not), pays one tax or the other on retail purchases, regardless of where the purchase is made. If all retail sales within a state are subject to a sales tax, then, because the buyer is exempt from use taxes on such sales, use taxes can only be imposed on the use of property purchased outside the state.

*Id.* 161 Ariz. at 517, 779 P.2d at 832.

The Arizona use tax is an excise, or privilege tax, on the "storage, use or consumption" of tangible personal property in Arizona. Arizona Revised Statutes section 42–1401(6) defines "storage" as "keeping or retaining tangible personal property purchased from a retailer for any purpose except sale in the regular course of business or subsequent use solely outside this state." Section 42–1401(8) defines "use or consumption" as "the exercise of any right or power over tangible personal property incidental to owning the property except holding for sale or selling the property in the regular course of business."

PCS contends that it does not use the cards in Arizona but merely stores and pro-

cesses them for ultimate use outside the state. It relies primarily on two cases, *Cosmair, Inc. v. Director, New Jersey Div. of Taxation,* 109 N.J. 562, 538 A.2d 788 (1988), and *Exxon Corp. v. Wyoming State Bd. of Equalization,* 783 P.2d 685 (Wyo.1989), *cert. denied,* 495 U.S. 910, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).

In *Cosmair,* the taxpayer, a perfume manufacturer, bottled samples in New Jersey for distribution to its retail customers outside the state. It stored the samples on its premises and boxed and labelled the boxes for shipment out of state. New Jersey's use tax statute excepted "mere storage, keeping, retention or withdrawal from storage" in the state. The *Cosmair* court held that:

> Cosmair's activities in this case—packaging, sorting, assembling, and labelling— were incidental to the withdrawal from storage of the samples. These tax-neutral activities arise whenever a manufacturer moves its inventory. If the incidental activities performed by Cosmair with respect to the samples render the exemption inapplicable, it is difficult to see how manufactured goods could ever be withdrawn from storage without losing the use tax exemption.

538 A.2d at 792.

Our first observation about *Cosmair* is that the court was generous to the taxpayer in labeling the taxpayer's packaging and labeling activities as "incidental" to storage of the samples. More important, PCS does more than box and place shipping labels on batches of the cards that it buys outside Arizona. It subjects them to sophisticated, capital-intensive processing that transforms them from blank cards into unique, individualized information-storage and identification devices that can be used only by a single member of a single prescription drug plan. It uses the cards as raw material for crafting items which, when presented by its clients' beneficiaries, facilitate PCS's performance of the services for which its clients pay. It uses or consumes the cards within the meaning of A.R.S. sections 42–1401(8) and 42–1408(A).

*Exxon* does not advance the taxpayer's case. Exxon bought pipe imported from Ja-

pan from a Texas company for the purpose of fabricating it into a pipeline. The pipeline was in Wyoming. While the pipe was in Colorado en route to Wyoming, Exxon inspected it, blasted it, and coated it with epoxy, all of which was necessary before the pipe could be used in the pipeline. Exxon voluntarily paid use taxes on the pipe to Colorado.

Wyoming, whose statute taxed the purchase or lease of property outside the state for "first use, storage or consumption within this state," also assessed a use tax on the pipe. The Wyoming court held that Exxon's processing in Colorado was not the "first use" of the pipe, but rather merely preparation for its intended use in Wyoming, and it sustained the Wyoming assessment. By analogy, PCS argues that the "first use" of its cards occurs outside Arizona.

What distinguishes *Exxon* and other similar decisions on which PCS relies [2] is that in each of them only a single entity—the taxpayer—engaged in the activities constituting "preparation for use" and "use." The only question in each case concerned which of the two jurisdictions was the one where the "use" had occurred. In contrast, PCS's use of the blank plastic cards occurred in Arizona, and only persons and entities other than PCS made any further use of the items. By encoding and stamping the blank cards, PCS was not merely preparing to use them, it was using them for the only purpose for which it, as opposed to its clients and their beneficiaries, would ever employ them.

This result is consonant with the function of the use tax as a complement to the transaction privilege tax on retail sales. PCS paid no sales tax to any jurisdiction when it bought the blank cards from sources outside Arizona. PCS does not resell the finished cards, and hence pays no transaction privi-

lege (sales) tax when it sends them out. Its clients' beneficiaries, the end-users, pay no sales or use tax on the finished cards because they do not purchase them at retail. But PCS exercises ownership rights over the blank cards in Arizona in a way unrelated to reselling them. The tax court correctly held that PCS uses, consumes, and stores its blank and pre-designed cards in Arizona within the meaning of A.R.S. section 42–1401 *et seq.*

### THE DEPARTMENT OF REVENUE IS NOT ESTOPPED TO LEVY THE TAX

■ PCS contends that even if the tax applies, it justifiably relied on the Department's 1983 decision not to tax the cards and urges that the Department is estopped to tax it retroactively for the period at issue here. Its argument runs squarely up against a provision of the Arizona Constitution and two cases decided by the Supreme Court of Arizona. Arizona Constitution article 9, section 1, provides in part: "The power of taxation shall never be surrendered, suspended, or contracted away." In two cases, the Arizona Supreme Court spoke definitively about the effect of this provision on the assertion of equitable estoppel against the state.

*Crane Co. v. Arizona State Tax Comm'n,* 63 Ariz. 426, 163 P.2d 656 (1945), *overruled on other grounds, Duhame v. State Tax Comm'n,* 65 Ariz. 268, 279, 179 P.2d 252, 259 (1947), revolved around the fact that the State Tax Commission had adopted a rule excepting certain items sold to contractors from taxation. Two years after adopting the rule, the Commission repealed it. The supreme court recognized that the taxpayer had relied on the prior rule so that as to a number of closed transactions it had no way to pass the cost of the tax on to buyers. It

**2.** *Rowan Drilling Co. v. Bureau of Revenue,* 60 N.M. 123, 288 P.2d 671 (1955); *Morrison–Knudsen Co. v. State Tax Comm'n,* 242 Iowa 33, 44 N.W.2d 449 (1950); *Comptroller of Treasury v. James Julian, Inc.,* 215 Md. 406, 137 A.2d 674 (1958); *Tawes v. Thompson Trailer Corp.,* 209 Md. 490, 121 A.2d 850 (1956).

Similarly, our decision in *Salt River Project Agricultural Improvement & Power District v. City*

*of Tempe,* 147 Ariz. 144, 708 P.2d 1335 (App. 1985), does not help PCS. In that case a single taxpayer stored property within Tempe and later used part but not all of it outside the city limits. We held only that the Tempe use tax ordinance's exemption for storing property for "subsequent use outside this city" was not to be construed to provide that all the stored property must be used outside the city before the exemption could be applied to any of it.

nonetheless upheld the tax and rejected the taxpayer's claim of estoppel:

> This court has never held that, insofar as a tax was concerned, the state may be estopped from the collection of a legal tax by reason of the action of any of its officers. The general rule is that the state will not be estopped in the collection of its revenues by an unauthorized act of its officers. In the matter of collecting revenues, the state is acting in its governmental or sovereign capacity, and ordinarily there can be no estoppel. Were this not the rule the taxing officials could waive most of the state's revenue. [Citations omitted.] The Constitution, Art. 9, Sec. 1, provides that the power of taxation (which must of necessity include collection) "shall never be surrendered, suspended, or contracted away." To hold that the commission by regulation may waive taxes which the law required to be imposed would be violative of this provision.

*Crane,* 63 Ariz. at 441, 163 P.2d at 662.

Two years later, in *Duhame,* the supreme court disapproved the holding in *Crane* that the sales to contractors were subject to the sales tax. However, it again declined to apply equitable estoppel against the state taxing authorities. It stated:

> It is true that during the time plaintiff was engaged in the contracting here in question he might have passed this tax on to the government had he not been misled, by an improper interpretation of the Act by the Commission, into believing no tax was due. Still, it is the settled law of the land and of this jurisdiction that as taxation is a governmental function, there can be no estoppel against a government or governmental agency with reference to the enforcement of taxes. Were this not the rule the taxing officials could waive most of the state's revenue. [Citations omitted.] Therefore there is no merit to plaintiff's claim of estoppel in this case.

*Duhame,* 65 Ariz. at 281, 179 P.2d at 260. The supreme court has never modified or overruled *Crane* or *Duhame* on this point.

The cases PCS relies on are not controlling. *Freightways Inc. v. Arizona Corp. Comm'n,* 129 Ariz. 245, 630 P.2d 541 (1981), was not a tax case and did not implicate article 9 section 2 of the Arizona Constitution or the concerns for the revenue expressed in *Crane* or *Duhame.* PCS's reliance on our decision in *Tucson Electric Power Co. v. Arizona Dep't of Revenue,* 174 Ariz. 507, 851 P.2d 132 (App.1992), is also misplaced. There we permitted the application of equitable estoppel against the Department of Revenue only as to a prior incorrect representation to the taxpayer about the particular procedure to be followed in claiming an income tax deduction to which we found it was clearly entitled as a matter of substance. We distinguished *Crane, Duhame* and other decisions as follows:

> The central principle underlying past Arizona decisions is that the sovereign power of the state to impose taxes is vested in the legislature, and the state taxing authorities may not, by their words or conduct, waive the collection of taxes imposed by a valid legislative enactment. All the Arizona tax decisions that we have found in which the court has refused to apply the doctrine of estoppel have involved situations in which the intent of the statute was to impose a tax upon the activities engaged in by the particular taxpayer. In seeking to avoid payment of the tax, imposed by the statute, the taxpayer was relying upon past actions or representations of taxing authorities to the effect that the statute did not impose a tax upon the taxpayer's activities. In each case, the court refused to permit the claimed action of the state taxing authorities to defeat the intent of the legislature to impose a tax on the very activities engaged in by the taxpayer.

> The taxpayer in this case, however, presents a very different situation. Here, the taxpayer is not relying upon estoppel to avoid the application of a taxing statute to the activities contemplated by the statute. In fact, it is clear from the statute that the sole intent of the legislature was to make the benefits of accelerated amortization available to a taxpayer, such as the taxpayer in this case, that has expended funds for pollution control purposes. It is undisputed in the record presented to this

court that, from a factual standpoint, the taxpayer clearly was entitled to claim the benefits of that accelerated amortization.

In advancing its estoppel argument, the taxpayer seeks to enforce, rather than avoid, the basic intent of the statute. The representations of the Department of Revenue that the taxpayer relies upon for its estoppel argument were not that the taxpayer's activities were not taxable. Rather, they related solely to a procedural matter—the sufficiency of compliance by the taxpayer with the statute's certification requirements.

174 Ariz. at 515, 851 P.2d at 140 (footnotes omitted). The representations on which PCS relies here, in contrast, were of precisely the kind that *Tucson Electric Power* indicated would not and could not support an estoppel claim against the taxing authorities—that PCS's activities were not subject to the use tax. *Accord Arizona Dep't of Revenue v. M. Greenberg Const.,* 182 Ariz. 397, 405, 897 P.2d 699, 707 (Ct.App.1995).

PCS also cites our recent decision in *Carlson v. Arizona Dep't of Economic Sec.,* 184 Ariz. 4, 906 P.2d 61 (Ct.App.1995), in which we rejected a claim of estoppel against the state which sought reimbursement from a person who had been issued an excess of food stamps. While we noted that estoppel can be applied against the state in some circumstances, the case does not deal with revenue collection and, hence, is of no assistance to PCS.

█ In a related vein, PCS contends that, apart from equitable estoppel, the Department's change of position on the applicability of the use tax to PCS should be given prospective effect only. We disagree. Our supreme court recently stated in *Wilderness World, Inc. v. Arizona Dep't of Revenue,* 182 Ariz. 196, 895 P.2d 108 (1995):

The presumption in civil cases is that opinions will operate retroactively. *Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 596, 790 P.2d 242, 251 (1990). We have set forth a three-part test for determining whether the presumption of retroactivity has been overcome and a decision should be applied prospectively only:

1. Whether the decision establishes a new legal principle by overruling clear and reliable precedent or by deciding an issue whose resolution was not foreshadowed;

2. Whether retroactive application will further or retard operation of the rule, considering the prior history, purpose, and effect of the rule;

3. Whether retroactive application will produce substantially inequitable results.

*Fain Land & Cattle,* 163 Ariz. at 596, 790 P.2d at 251.

182 Ariz. at 199, 895 P.2d at 113.

This is not a case in which a state agency has attempted retroactively to change an administrative ruling or regulation of general application, *see George v. Arizona Corp. Comm'n,* 83 Ariz. 387, 322 P.2d 369 (1958), or in which an established holding of an appellate court has been overruled, *see Arizona State Tax Comm'n v. Ensign,* 75 Ariz. 376, 257 P.2d 392 (1953). As we stated in *Tucson Electric Power v. Department of Revenue,* 170 Ariz. 145, 822 P.2d 498 (App.1991):

In this case ... Tucson Electric cannot claim to have relied on any holding by an Arizona court to the effect that revenues from minimum demand charges are nontaxable. As we have stated:

[E]ven where there is a clear administrative practice of applying the taxing statutes in a certain manner, that practice does not mandate continued adherence where the taxing statute is clear and requires a different result.

*Arizona Lotus Corp. v. City of Phoenix,* 136 Ariz. 22, 24, 663 P.2d 1013, 1015 (App. 1983) (citations omitted).

170 Ariz. at 150, 822 P.2d at 503.

Retroactive application of the correct interpretation of the scope of Arizona's use tax statutes to PCS will further the purposes of those statutes as they existed during the period in question. Further, PCS does not convince us that this will truly produce substantially inequitable results. Notwithstanding the Department's acquiescence in PCS's arguments with respect to an earlier audit period, we think the meaning and scope of A.R.S. sections 42–1401 and 42–1408 was and

is clear. As the Department now argues: "The incorrect understanding of the law or insufficient investigation by the Department at one time in the past does not act as a bar [to] the assessment and collection of taxes rightfully due and owing. The statute of limitations already prevents the Department from fully reversing the effects." For that reason, and because the application of the use tax to the blank cards appears clear, we decline to order a refund. *Cf.* A.R.S. § 42–139.02 (prohibiting only assessment of interest and penalty, not assessment of deficiency, where deficiency is directly attributable to erroneous written advice furnished by the Department employee acting in an official capacity in response to a specific request).

The judgment is affirmed. The opinion of the tax court, 176 Ariz. 628, 863 P.2d 920, is approved as supplemented by this opinion.

THOMPSON, P.J., and WEISBERG, J., concur.