729 A.2d 385

**Anne CREEL, Personal Representative of the Estate of Joseph Creel**

**v.**

**Arnold R. LILLY, Individually and d/b/a Good Ole Boys Racing et al.**

**No. 77, Sept. Term, 1998.**

Court of Appeals of Maryland.

May 12, 1999.

78

Arthur G. House (Ross & Hardies, Washington, DC; Ronald A. Brown, Waldorf), all on brief, for Petitioner.

Patrick B. Murphy (Stephen P. Fitzgerald, Mudd, Mudd and Fitzgerald, P.A., on brief), La Plata, for Respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

The primary issue presented in this appeal is whether Maryland's Uniform Partnership Act (UPA), Maryland Code (1975, 1993 Repl.Vol., 1998 Supp.), Corporations and Associations Article, § 9–101 et seq.,[1] permits the estate of a deceased partner to demand liquidation of partnership assets in order to arrive at the true value of the business. Specifically, Petitioner (Anne Creel) maintains that the surviving partners have a duty to liquidate all partnership assets because (1) there is no provision in the partnership agreement providing for the continuation of the partnership upon a partner's death and (2) the estate has not consented to the continuation of the business. Respondents (Arnold Lilly and Roy Altizer) contend that because the surviving partners wound up the partnership in good faith, in that they conducted a full inventory, provided an accurate accounting to the estate for the value of the business as of the date of dissolution, and paid the estate its proportionate share of the surplus proceeds, they are under no duty to liquidate the partnership's assets upon demand of the deceased partner's estate.

---

1. Unless otherwise· indicated, all Uniform Partnership Act statutory references are to Maryland Code (1975, 1993 Repl.Vol., 1998 Supp.), Corporations and Associations Article.

As discussed in more detail in Part II.A., *infra*, UPA, which has governed partnerships in this State for the past 80 years, has been repealed since this litigation commenced. The Act that now governs Maryland partnerships is the Revised Uniform Partnership Act (RUPA), Maryland Code (1975, 1993 Repl.Vol., 1998 Supp.), Corporations and Associations Art., § 9A–101 *et seq.*,[2] which was adopted in July 1998 with a phase-in period. Therefore, until December 31, 2002, both UPA and RUPA will coexist, with § 9A–1204 determining which Act applies to a particular partnership's formation, termination, and any other conflict that may arise.

At the outset we note there is a partnership agreement in the instant case that, while somewhat unclear, seems to provide for an alternative method of winding up the partnership rather than a liquidation of all assets. The circuit court and intermediate appellate court both found the agreement unclear as to dissolution and winding up of the business upon the death of a partner and correctly turned to UPA as an interpretative aid. In looking specifically at the trial court's order, the trial judge referred to the partnership agreement and UPA but was not explicit as to which one he primarily relied on in holding that a forced sale of all assets was not required in this case. Regardless, the trial judge's interpretation of the partnership agreement and holding are in conformity with UPA.

Due to our uncertainty as to whether the trial court's holding was based primarily on the partnership agreement or UPA, and also because clarification of the liquidation issue implicates other aspects of partnership law, we will examine not only the partnership agreement itself, but also Maryland's UPA and applicable case law, the cases in other jurisdictions that have interpreted the liquidation issue under UPA, and the newly adopted RUPA. For the reasons stated in this opinion, we concur in the finding of the courts below that Respondents

---

**2.** Unless otherwise indicated, all Revised Uniform Partnership Act (RUPA) statutory references are to Md. Code (1975, 1993 Repl.Vol., 1998 Supp.), Corporations and Associations Art.

are under no duty to "liquidate on demand" by Petitioner, as UPA does not mandate a forced sale of all partnership assets in order to ascertain the true value of the business. Winding up is not always synonymous with liquidation, which can be a harsh, drastic, and often unnecessary course of action. A preferred method in a good faith winding up, which was utilized in this case, is to pay the deceased partner's estate its proportionate share of the value of the partnership, derived from an accurate accounting, without having to resort to a full liquidation of the business. To hold otherwise vests excessive power and control in the deceased partner's estate, to the extreme disadvantage of the surviving partners. Thus, on this issue, we affirm the judgment of the Court of Special Appeals.

In this appeal, Petitioner also asks us to award the estate its share of the partnership profits generated by the Respondents' alleged continued use of the partnership assets for the period of time during which Petitioner claims the Respondents neither liquidated the business nor agreed to pay the estate its proper percentage share of the partnership. *See* footnote 7. We reject Petitioner's request and agree with the courts below that there is no basis for damages because Good Ole Boys Racing (Good Ole Boys) is a successor partnership and not a continuation of Joe's Racing, which was properly wound up and terminated before the new partnership began operations.

## I. BACKGROUND

On approximately June 1, 1993, Joseph Creel began a retail business selling NASCAR racing memorabilia. His business was originally located in a section of his wife Anne's florist shop, but after about a year and a half he decided to raise capital from partners so that he could expand and move into his own space. On September 20, 1994, Mr. Creel entered into a partnership agreement—apparently prepared without the assistance of counsel—with Arnold Lilly and Roy Altizer to form a general partnership called "Joe's Racing." The partnership agreement covered such matters as the partnership's purpose, location, and operations, and stated the following regarding termination of the business:

**"7. TERMINATION**

(a) That, at the termination of this partnership a full and accurate inventory shall be prepared, and the assets, liabilities, and income, both in gross and net, shall be ascertained: the remaining debts or profits will be distributed according to the percentages shown above in the 6(e).

\* \* \*

(d) Upon the death or illness of a partner, his share will go to his estate. If his estate wishes to sell his interest, they must offer it to the remaining partners first."

The three-man partnership operated a retail store in the St. Charles Towne Center Mall in Waldorf, Maryland. For their initial investment in Joe's Racing, Mr. Lilly and Mr. Altizer each paid $6,666 in capital contributions, with Mr. Creel contributing his inventory and supplies valued at $15,000. Pursuant to the partnership agreement, Mr. Lilly and Mr. Altizer also paid $6,666 to Mr. Creel ($3,333 each) "for the use and rights to the business known as Joe's Racing Collectables." The funds were placed in a partnership bank account with First Virginia Bank–Maryland. All three partners were signatories to this account, but on May 19, 1995, unknown to Mr. Lilly and Mr. Altizer, Mr. Creel altered the account so that only he had the authority to sign checks. It was only after Mr. Creel's death that Mr. Lilly and Mr. Altizer realized they could not access the account funds, which were frozen by the bank upon Mr. Creel's passing. Moreover, on approximately February 20, 1995, Mr. Creel paid a $5,000 retainer to an attorney without his partners' knowledge. He wanted the attorney to prepare documents for the marketing of franchises for retail stores dealing in racing memorabilia.

Joe's Racing had been in existence for almost nine months when Mr. Creel died on June 14, 1995. Mrs. Creel was appointed personal representative of his estate. In this capacity, and acting without the knowledge of the surviving partners, Mrs. Creel and the store's landlord agreed to shorten the lease by one month so that it expired on August 31, 1995.

June, July, and August's rent was paid by Mr. Lilly and Mr. Altizer.

In accordance with § 9–602(4),[3] Joe's Racing was automatically dissolved upon Mr. Creel's death and because the partnership agreement did not expressly provide for continuation of the partnership nor did his estate consent to its continuation, the surviving partners were required under UPA to wind up the business. *See* § 9–601 and § 9–609(a). In order to pay debts and efficiently wind up the partnership affairs, Mr. Lilly and Mr. Altizer requested that Mrs. Creel and the bank release the funds in the partnership account ($18,115.93 as of July 13, 1995). Their request was refused and it was at this point that litigation commenced. We adopt the following procedural history of this case, as detailed in the unreported opinion of the Court of Special Appeals:

"Not receiving a favorable response, the surviving partners, on behalf of Joe's Racing, brought an action in the District Court against Mrs. Creel, individually and as personal representative of her late husband's estate, and First Virginia Bank–Maryland. Mrs. Creel filed a demand for a jury trial, which brought the case to the circuit court. By way of a counterclaim, the bank filed a complaint for interpleader. The court authorized the bank to deposit with the court the money in the partnership account, dismissed the bank from the suit, and ordered that the conflicting claims of the parties be transferred to the funds on deposit, with the case to proceed as one between the Joe's Racing partnership and Ann [sic] Creel, individually and as Personal Representative of the Estate of Joseph Creel.

In the meantime, [Mrs. Creel] had filed in the circuit court a complaint seeking an accounting and a declaratory judgment against Messrs. Lilly and Altizer, individually and doing business under the name "Good Ole Boys Rac-

---

3. Section 9–602 states in pertinent part:
   "Dissolution is caused:
        *    *    *    *    *    *
     (4) By the death of any partner[.]"

ing." She asserted that, instead of winding up the affairs of Joe's Racing in accordance with her demand, Lilly and Altizer continued the partnership business under a new name, using the assets of the partnership. Lilly and Altizer, as general partners of Joe's Racing, and Joe's Racing had also filed in the circuit court a complaint against Mrs. Creel, the Estate of Joseph Creel, and the bank, seeking to recover the $18,115.93 that was in the partnership's checking account. [Mr. Lilly and Mr. Altizer] later filed an Amended Complaint/Counter Complaint for Declaratory Relief, naming Mrs. Creel, as Personal Representative, as the sole defendant, seeking, *inter alia*, a declaration as to the amounts the Estate of Joseph Creel was entitled to by way of return of capital contributions and as Joseph Creel's share of the net value of the partnership as of the time of dissolution.

Rejecting [Mrs. Creel's] request to refer the matter to an auditor for an accounting as (a) untimely (and therefore likely to delay final resolution of the case) and (b) unnecessary, the court [, after a four-day trial,] determined that Joseph Creel had a 52% interest in the partnership instead of a 36% interest as claimed by [Mr. Lilly and Mr. Altizer]; that Joseph Creel's expenditure of $5,000 of partnership funds for legal assistance was an expense chargeable to the partnership and did not justify reduction of his capital contribution by [$]5,000 as contended by [Mr. Lilly and Mr. Altizer]; and that effecting a change in the partnership bank account so that only he could sign checks was not a breach of fiduciary duty by Mr. Creel.

The court also found that the surviving partners sought to wind up and close out the partnership and took all reasonable steps to do so, and that there was no breach by them of any fiduciary duty to the Estate. The lease on the store premises occupied by the partnership expired on 31 August 1995, and on that date Mr. Lilly conducted an inventory of all merchandise in the store. Based on that inventory, an accountant computed the value of the partnership business; Mrs. Creel was invited to review the books and records and

retain her own accountant or appraiser if she questioned [Mr. Lilly or Mr. Altizer's] figures. *She declined to do so. After 31 August 1995, Messrs. Lilly and Altizer ceased doing business as Joe's Racing and began doing business together under the name 'Good Ole Boys Racing.'*

*The court accepted the valuation prepared by [Mr. Lilly and Mr. Altizer's] accountant as the correct value of the partnership assets as of 31 August 1995, and found that the surviving partners fully disclosed and delivered to the Estate all records of the financial affairs of the Joe's Racing partnership up to 31 August 1995, which the court took to be the end of the winding up period. Rejecting [Mrs. Creel's] assertions (1) that [Mr. Lilly and Mr. Altizer] were obligated to liquidate the partnership assets in order to wind up the partnership; (2) that [Mr. Lilly and Mr. Altizer], instead of winding up the partnership by liquidating its assets, misappropriated partnership assets, i.e., inventory to make a profit, for which they were obligated to account;* and (3) that the Estate was entitled to 52% of such profits, the court declared that the Estate was entitled to a total of $21,631....

\* \* \*

On the basis of those findings, the court ordered that [Mrs. Creel] could withdraw the funds deposited in court by the bank and that [Mr. Lilly and Mr. Altizer] should pay [Mrs. Creel] the difference between the amount of those funds and $21,631.00." (Emphasis added).

The Court of Special Appeals affirmed the judgment of the Circuit Court for Charles County, finding that under UPA "winding up" does not always mean "liquidate;" therefore, Joe's Racing had no duty to sell off all of its assets in a liquidation sale. The court also held that Good Ole Boys was not a continuation of Joe's Racing, and as such the Creel estate was not entitled to damages equal to a share of the profits allegedly made by the successor partnership. Mrs. Creel filed a petition for certiorari in May 1998, which we granted.

## II.  DISCUSSION AND ANALYSIS

### A.

We begin our analysis by reviewing the law of partnership as it pertains to the issues in this case.  Maryland enacted UPA in 1916.  *Shafer Bros. v. Kite,* 43 Md.App. 601, 607, 406 A.2d 673, 677 (1979).  Section 9–101(g) defines a partnership as "an association of two or more persons to carry on as co-owners [of] a business for profit." There is no requirement that the partnership be formally established with a writing; so long as this definition is met, a partnership exists whether the parties intend it to or not.  However, the "general rule is that the partnership agreement governs the relations among the partners and between the partners and the partnership.  The provisions of [UPA] govern to the extent the partnership agreement does not provide otherwise."  John W. Larson et al., *Revised Uniform Partnership Act Reflects a Number of Significant Changes,* 10 J. Partnership Tax'n 232, 233 (1993)(footnote omitted).

A partnership is either (1) for a definite term or a particular undertaking or (2) at will, which means the business has no definite term or particular undertaking.  59A Am. Jur.2d *Partnership* §§ 89 & 90 (1987).  *See also* § 9A–101(k).  An at-will partnership continues indefinitely and can be dissolved by the express will of any partner or automatically by the happening of a specific event as mandated by UPA, such as the death of a partner.  59A Am.Jur.2d *Partnership* § 89 (1987).  *See also* § 9–602(4).  Under UPA, partners may avoid the automatic dissolution of the business upon the death of a partner by providing for its continuation in their partnership agreement.  *See Gerding v. Baier,* 143 Md. 520, 524, 122 A. 675, 677 (1923).  Sophisticated partnerships virtually always use carefully drafted partnership agreements to protect the various partners' interests by providing for the continuation of the business, the distribution of partnership assets, etc., in the face of various contingencies such as death.  *See* Judson A. Crane & Alan R. Bromberg, Law of Partnership § 73, at 417–19 (1968).  Less sophisticated partnerships, however, are often

operating under oral terms or a "homemade" agreement that does not contain protections for the partners or the business.

■ While the death of a partner automatically dissolves the partnership unless there is an agreement stating otherwise, the partnership is not terminated until the winding-up process is complete. *Miller v. Salabes*, 225 Md. 53, 59, 169 A.2d 671, 672 (1961). *See also* § 9–601 ("On dissolution, the partnership is not terminated, but continues until the winding up of partnership affairs is completed.") Winding up is generally defined as "getting in the assets, settling with [the] debtors and creditors, and appropriating the amount of profit or loss [to the partners]." *Comp. of Treas. v. Thompson Tr. Corp.*, 209 Md. 490, 501–02, 121 A.2d 850, 856 (1956)(quoting *Lafayette Trust Co. v. Beggs*, 213 N.Y. 280, 107 N.E. 644, 645 (1915)). The surviving partners have the right to wind up the partnership or the deceased partner's representative may obtain a winding up through the courts. *See* § 9–608. Section 9–609 details the winding-up procedures and whether Subsection (a) or (b) applies depends on whether dissolution was caused in contravention of the partnership agreement or not, wrongfully, etc. The winding-up procedure that applies in this case is found in § 9–609(a), which states in pertinent part: "When dissolution is caused in any way . . . each partner . . . unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners."

Historically, under many courts and commentators' interpretation of UPA, when a partner died and the partnership automatically dissolved because there was no consent by the estate to continue the business nor was there a written agreement allowing for continuation, the estate had the right to compel liquidation of the partnership assets. *See Gianakos Ex'r v. Magiros*, 238 Md. 178, 183, 208 A.2d 718, 721 (1965)(noting surviving partners' right to continue the business "if he has the consent of the representative of the deceased partner and there is no agreement to the contrary").

Reducing all of the partnership assets to cash through a liquidation was seen as the only way to obtain the true value of the business. *Dreifuerst v. Dreifuerst,* 90 Wis.2d 566, 280 N.W.2d 335, 338 (Wis.Ct.App.1979). However, while winding up has often traditionally been regarded as synonymous with liquidation, this "fire sale" of assets has been viewed by many courts and commentators as a harsh and destructive measure. Consequently, to avoid the drastic result of a forced liquidation, many courts have adopted judicial alternatives to this potentially harmful measure. *See Fortugno v. Hudson Manure Company,* 51 N.J.Super. 482, 144 A.2d 207, 219 (App.Div. 1958)(court approved an alternative proposal to the complete liquidation of the partnership, stating that it "recogniz[ed] that a forced sale of the partnership will destroy a great part of the value of the business. . . ."). *See also* full discussion on judicial alternatives to liquidation in Part II.B., *infra.*

Over time, the UPA rule requiring automatic dissolution of the partnership upon the death of a partner, in the absence of consent by the estate to continue the business or an agreement providing for continuation, with the possible result of a forced sale of all partnership assets was viewed as outmoded by many jurisdictions including Maryland. The development and adoption of RUPA by the National Conference of Commissioners on Uniform State Laws (NCCUSL) mitigated this harsh UPA provision of automatic dissolution and compelled liquidation.

RUPA's underlying philosophy differs radically from UPA's, thus laying the foundation for many of its innovative measures. RUPA adopts the "entity" theory of partnership as opposed to the "aggregate" theory that the UPA espouses. Thomas R. Hurst, *Will the Revised Uniform Partnership Act (1994) Ever Be Uniformly Adopted?,* 48 FLA. L.REV. 575, 579 (1996). Under the aggregate theory, a partnership is characterized by the collection of its individual members, with the result being that if one of the partners dies or withdraws, the partnership ceases to exist. *See* Joan E. Branch, Note, *The Revised Uniform Partnership Act Breakup Provisions: Should They Be Adopted?,* 25 CREIGHTON L.REV. 701, 701

(1992). On the other hand, RUPA's entity theory allows for the partnership to continue even with the departure of a member because it views the partnership as "an entity distinct from its partners." Section 9A–201.

This adoption of the entity theory, which permits continuity of the partnership upon changes in partner identity, allows for several significant changes in RUPA. Of particular importance to the instant case is that under RUPA "a partnership no longer automatically dissolves due to a change in its membership, but rather *the existing partnership may be continued if the remaining partners elect to buy out the dissociating partner*." [4] *Will the Revised Uniform Partnership Act (1994) Ever Be Uniformly Adopted?*, 48 FLA. L.REV. at 579 (emphasis added)(footnote omitted). In contrast to UPA, RUPA's "buyout" option does not have to be expressly included in a written partnership agreement in order for it to be exercised; however, the surviving partners must still actively choose to exercise the option, as "continuation is not automatic as with a corporation." *Will the Revised Uniform Partnership Act (1994) Ever Be Uniformly Adopted?*, 48 FLA. L.REV. at 579–80 (footnote omitted). This major RUPA innovation therefore delineates two possible paths for a partnership to follow when a partner dies or withdraws: "[o]ne leads to the winding up and termination of the partnership and the other to continuation of the partnership and purchase of the departing partner's share." *Will the Revised Uniform Partnership Act (1994) Ever Be Uniformly Adopted?*, 48 FLA. L.REV. at 583 (footnote

---

**4.** RUPA uses the term "dissociation" rather than dissolution. "Dissociation" is viewed as having a less significant impact on the partnership than dissolution, which is in line with RUPA's entity theory of partnership of continuing the business whenever possible. John W. Larson et al., *Revised Uniform Partnership Act Reflects a Number of Significant Changes*, 10 J. PARTNERSHIP TAX'N 232, 236 (1993). *See also* § 9A–601, which describes the events causing a partner's dissociation, including death. Under RUPA, a dissociation may result in dissolution and a winding up of partnership business. *See* §§ 9A–801 through 9A–807, which provide for the winding up of partnership business. Even after a dissociation leads to a dissolution, RUPA offers a final opportunity for the partners to continue the partnership if they so choose. *See* § 9A–802(b).

omitted). Critically, under RUPA the estate of the deceased partner no longer has to consent in order for the business to be continued nor does the estate have the right to compel liquidation.

Like UPA, RUPA is a "gap filler" in that it only governs partnership affairs to the extent not otherwise agreed to by the partners in the partnership agreement. *See* 9A–103(a), which states: "[R]elations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this title governs relations among the partners and between the partners and the partnership." There are certain RUPA provisions, however, that partners cannot waive, such as unreasonably restricting the right of access to partnership books and records, eliminating the duty of loyalty, unreasonably reducing the duty of care, and eliminating the obligation of good faith and fair dealing. *See* § 9A–103(b).

Along with 18 other states,[5] Maryland has adopted RUPA, effective July 1, 1998, with a phase-in period during which the two Acts will coexist. As of January 1, 2003, RUPA will govern all Maryland partnerships. *See* § 9A–1204. In adopting RUPA, the Maryland legislature was clearly seeking to eliminate some of UPA's harsh provisions, such as the automatic dissolution of a viable partnership upon the death of a partner and the subsequent right of the estate of the deceased partner to compel liquidation. In essence, the NCCUSL drafted RUPA to reflect the emerging trends in partnership law. RUPA is intended as a flexible, modern alternative to the more rigid UPA and its provisions are consistent with the

---

**5.** To date, RUPA has been adopted in the following states: Alabama, Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, Oregon, Texas, Virginia, West Virginia, and Wyoming. BUSINESS AND NONPROFIT ORGANIZATIONS AND ASSOCIATIONS LAWS 6 U.L.A. 1 (1998 Supp.). The National Conference of Commissioners on Uniform State Laws refers to the revised act as "Uniform Partnership Act (1996)." Maryland adopted the act as the "Revised Uniform Partnership Act," or RUPA, as we refer to it in this opinion.

reasonable expectations of commercial parties in today's business world.

### B.

As discussed earlier, the traditional manner in which UPA allows for the continuation of the partnership upon the death of a partner is to either obtain the consent of the deceased partner's estate or include a continuation clause in the partnership agreement. *Gianakos*, 238 Md. at 183, 208 A.2d at 721. There have been several cases in other jurisdictions, however, where neither of these conditions was met and the court elected another option under UPA instead of a "fire sale" of all the partnership assets to ensure that the deceased partner's estate received its fair share of the partnership. *See Cutler v. Cutler*, 165 B.R. 275, 278 (Bankr.D.Ariz.1994)("The winding up process does not necessarily mean that the assets of the partnership must be liquidated, although that is one option."). These jurisdictions have recognized the unfairness and harshness of a compelled liquidation and found other judicially acceptable means of winding up a partnership under UPA, such as ordering an in-kind distribution of the assets or allowing the remaining partners to buy out the withdrawing partner's share of the partnership.

While the following cases have not involved the specific situation that we are faced with here—dissolution upon the death of a partner—the options the various courts have adopted to avoid a compelled liquidation of all partnership assets are equally applicable to the instant case. A dissolution is a dissolution and a winding-up process is a winding-up process, no matter what the underlying reason is for its occurrence. The reason for the dissolution is relevant when liabilities are being apportioned among partners, such as in a wrongful dissolution, but such is not the concern in the instant case. Many of these cases also involve a continued partnership, as opposed to a successor partnership like Good Ole Boys, but again the various courts' reasons for not compelling a sale of all assets in order to arrive at the true value of the business are equally applicable to the instant case.

We look to the case law of other jurisdictions because this is a case of first impression in Maryland. The Maryland cases cited by Petitioner and Respondent in their briefs and during arguments are inapposite and offer little assistance in the task before us. We now turn to a discussion of out-of-state cases that have confronted the issue of whether, under UPA, a compelled liquidation in a dissolution situation is always mandated or whether there are other judicially acceptable alternatives.

### 1. In–Kind Distribution

We first examine the cases where the court elected to order an in-kind distribution rather than a compelled liquidation in order to ascertain the true value of the partnership. An in-kind distribution is the actual division and distribution of the physical assets themselves. *See* BLACK'S LAW DICTIONARY 475 (6 th ed.1990)(defining "[d]istribution in kind" as "[a] transfer of property 'as is' ").

In *Nicholes v. Hunt,* the parties orally agreed to form a partnership for the manufacture and sale of shot. 273 Or. 255, 541 P.2d 820, 822–23 (1975). The relationship between the two partners quickly soured, with Nicholes alleging that he was being wrongfully excluded from the business by Hunt. Nicholes sought a dissolution decree, requesting that the partnership assets be liquidated at a sale. In holding that the partnership assets could be apportioned without resorting to a sale, the Supreme Court of Oregon stated: *"There is no express provision in [UPA] which establishes liquidation by sale as the exclusive mode of distributing partnership assets after dissolution.* Although the basic rule is that any partner has the right to force liquidation by sale, the rule has been subject to criticism . . . ." *Nicholes,* 541 P.2d at 827 (emphasis added).

The court went on to quote extensively from a law review article, stating in pertinent part:

" '[T]he liquidation right will be injurious to the business in many, perhaps in most, cases. One authority has described it as "ruinous." Whether it really is depends on

the relative value of the business sold and the business retained. Such values are partly subjective and partly influenced by specific facts. But, it is rare that a small business, which is the kind most partnerships are, can be sold for as much as the owners think it is worth to themselves. This is true if it is disposed of intact as a going concern, and even more so if it is sold piecemeal. *In short, the likelihood of loss of value is great enough to require every partnership to look to the ways of denying or restricting the liquidation right.'* " (Emphasis added).

*Nicholes,* 541 P.2d at 827 (quoting Alan R. Bromberg, *Partnership Dissolution—Causes, Consequences, and Cures,* 43 TEX. L.REV. 631, 647–48 (1965)(footnote omitted)).

In support of its holding, the Oregon court looked to the Michigan case of *Rinke v. Rinke,* 330 Mich. 615, 48 N.W.2d 201 (1951). *Rinke* involved two withdrawing partners seeking dissolution of two family partnerships, one a hardware and appliance business and the other dealing with the sale and servicing of automobiles. In upholding the trial court's decree that divided the partnership's assets rather than mandating a sale and the distribution of cash proceeds, the Supreme Court of Michigan held:

"Appellants insist that [dividing the assets] is erroneous and not contemplated by the [U]niform [P]artnership [A]ct. . . . *Constructing together pertinent provisions of the statute leads to the conclusion that it was not the intention of the legislature in the enactment of the Uniform Partnership Act to impose a mandatory requirement that, under all circumstances, the assets of a dissolved partnership shall be sold and the money received therefor divided among those entitled to it. . . .* The situation disclosed by the record in the present case is somewhat unusual in that no one other than the former partners is interested in the assets of the businesses. In view of this situation and of the nature of the assets, we think that the trial court was correct in apportioning them to the parties. There is no

showing that appellants have been prejudiced thereby."
(Emphasis added).

*Rinke,* 48 N.W.2d at 207.

Two other cases where the court ordered an in-kind distribution rather than a liquidation sale are *Logoluso v. Logoluso,* 233 Cal.App.2d 523, 43 Cal.Rptr. 678 (1965) and *Kelley v. Shay,* 206 Pa. 208, 55 A. 925 (1903). *Logoluso* involved a dissolution proceeding of a farming partnership. The Respondents argued that in the absence of an agreement of the partners authorizing a distribution of assets in kind, the trial court only had the authority to order a sale of the partnership assets. In upholding the trial court's order of an in-kind distribution of the partnership assets, the California court declared:

"[W]e hold that in a partnership dissolution action a court has authority to make distribution of partnership . . . property in kind. * * * [I]t is not necessary to hold a sale in order to satisfy partnership obligations. Absent a compelling necessity to satisfy partnership obligations, a public sale of assets can be justified only if it is found that distribution in kind would result in great prejudice to the parties." (Emphasis added).

*Logoluso,* 43 Cal.Rptr. at 682.

*Kelley* dealt with the ownership of stock in a natural gas company, apparently not controlled by the partnership. The Supreme Court of Pennsylvania found that one partner would have an advantage over the other in bidding for the stock, and thus ordered it to be distributed in kind. The court looked to equity principles in holding: "Equity and good conscience, therefore, require that in the present case the stock should be divided in kind, rather than that it should be sold and the proceeds divided." *Kelley,* 55 A. at 927. For another case where a court relied on equitable principles in refusing to order a liquidation, *see also Gelphman v. Gelphman,* 142 Kan. 582, 50 P.2d 933, 936 (1935)(holding that in the absence of a specific request at trial to sell the partnership assets, "[i]t was competent for the court, sitting as a court of equity, to

adjudge the disposition of the partnership property, to order conveyances of partnership property, and to make division of partnership assets.").

## 2. Buy–Out Option

We turn to the line of cases where the court allowed the remaining partners to buy out the withdrawing partner's interest in the partnership, rather than mandate a forced sale of assets to derive the true value of the business.

In *Gregg v. Bernards*, 250 Or. 458, 443 P.2d 166 (1968), Gregg appealed from a decree that dissolved the partnership and vested in Bernards the title to a race horse, the main partnership asset, upon payment by Bernards to Gregg the value of his partnership interest and also his share of the profit. The Supreme Court of Oregon affirmed the trial court's alternative resolution—a buy-out option—to a forced sale of the race horse. *Gregg*, 443 P.2d at 167.

*Goergen v. Nebrich* also involved a court refusing to order a public sale of the partnership assets in a dissolution situation and instead mandating a buy-out option. 12 Misc.2d 1011, 174 N.Y.S.2d 366 (N.Y.Sup.Ct.1958). Dissolution of the two-person partnership was sought on the basis of one partner's incompetency due to illness. After the decree was entered, the incompetent partner died and his estate wanted a public sale of all partnership assets. The New York court held that the partnership assets must be properly appraised to ascertain the true value of the business, but stated that "this does not mean that there must be a . . . sale of the partnership assets." *Goergen*, 174 N.Y.S.2d at 369. The court held that because the surviving partner wanted to continue the business, "it would be inequitable and unfair to the surviving partner to have a public sale." *Goergen*, 174 N.Y.S.2d at 369. The court then went on to outline its alternative proposal to a sale of the assets:

"The legal representative of the deceased partner will be fully protected by a disinterested appraisal of the assets of the former partnership and by receiving decedent's share on the purchase of the deceased partner's assets by the surviv-

ing partner at the appraisal price. For this purpose, the Court will appoint two qualified, disinterested appraisers to make an appraisal of the firm's assets and upon the filing with the Court of such appraisals and the final accounting ... *the Court will approve the sale of the deceased partner's interest to the surviving partner* providing that cash is paid for said interest. If the surviving partner is unable to do this, then it will be necessary, in the interest of justice to order a public sale." (Emphasis added).

*Goergen,* 174 N.Y.S.2d at 369–70.

Similarly, in *Fortugno* the court adopted what it called a "novel" alternative to a forced sale of the partnership assets. 144 A.2d at 219. As in *Goergen,* the New Jersey court was willing to adopt the alternative proposal, but if it was not executed properly by the partners, then a liquidation sale would be ordered. The court held:

"*[R]ecognizing that a forced sale of the partnership will destroy a great part of the value of the business[,] we approve the alternative proposal....* If the opposing partners will agree to the entry of an order for the appraisal of the partnership under the direction of the court and directing them to pay [the withdrawing partner] one-eighth of the valuation determined upon, such an order will be entered. Otherwise, there will be a liquidation by sale of all the partnership assets...." (Emphasis added).

*Fortugno,* 144 A.2d at 219.

Another case in which the court ordered a buy-out option rather than a forced sale of assets is *Wanderski v. Nowakowski,* 331 Mich. 202, 49 N.W.2d 139 (1951). Nowakowski was not required to liquidate the partnership's assets, pay off creditors, and then settle accounts between himself and the withdrawing partner, Wanderski. Instead, he was entitled to continue operations, provided that he paid Wanderski the fair value of his interest in the partnership as of the date of dissolution. The Supreme Court of Michigan allowed Nowakowski this alternative to a forced sale, even though their partnership agreement did not contain any provision regard-

ing the continuation of the business after dissolution. *Wanderski*, 49 N.W.2d at 142–44. *See also Dow v. Beals*, 149 Misc. 631, 268 N.Y.S. 425, 427 (N.Y.Sup.Ct.1933)(refusing to order liquidation sale of partnership assets and instead mandating that Dow pay to his former partners their proportionate shares of the business).

## C.

In applying the law discussed in Part II.A. and B. to the facts of this case, we want to clarify that while UPA is the governing act, our holding is also consistent with RUPA and its underlying policies. The legislature's recent adoption of RUPA indicates that it views with disfavor the compelled liquidation of businesses and that it has elected to follow the trend in partnership law to allow the continuation of business without disruption, in either the original or successor form, if the surviving partners choose to do so through buying out the deceased partner's share.

In this appeal, however, we would arrive at the same holding regardless of whether UPA or RUPA governs. Although our holding departs from the general UPA rule that the representative of the deceased partner's estate has a right to demand liquidation of the partnership, as we discuss in this subsection, *infra*, our position of "no forced sale" hardly represents a radical departure from traditional partnership law. The cases discussed in Part II.B., *supra*, many of which arose early in UPA's existence, illustrate the lengths other courts have gone to in order to avoid a compelled liquidation and adopt an alternative method for ascertaining the true value of a partnership. With that background, we turn to a discussion of the two issues Mrs. Creel raises in this appeal.

### 1. Compelled Liquidation Issue

The first issue is whether the Creel estate has the right to demand liquidation of Joe's Racing where its partnership agreement does not expressly provide for continuation of the partnership and where the estate does not consent to continuation. Before we move on to our analysis of the

compelled liquidation issue, we point out that our finding that Good Ole Boys is a successor partnership, rather than a continuation of Joe's Racing, does not negate the need for a complete discussion of this issue. Unless there is consent to continue the business or an agreement providing for continuation, upon the death of a partner the accurate value of the partnership must be ascertained as of the date of dissolution and the proportionate share paid to the deceased partner's estate, no matter if we are dealing with a subsequent new partnership or a continuation of the original business. If a compelled liquidation of all partnership assets is seen as the only way to arrive at its true value, then property from the original partnership will have to be sold whether the present business is a continuation or a successor business; regardless, the potential harm of such a "fire sale" affects both equally. *See* Part II.C.2., for a full discussion of our characterization of Good Ole Boys.

### a.

■■ Because a partnership is governed by any agreement between or among the partners, we must begin our analysis of the compelled liquidation issue by examining the Joe's Racing partnership agreement. We reiterate that both UPA and RUPA only apply when there is either no partnership agreement governing the partnership's affairs, the agreement is silent on a particular point, or the agreement contains provisions contrary to law. *See* §§ 9–401, 9–608, 9–609, 9–611, 9–613, and 9–614, which contain phrases such as "subject to any agreement between [the partners]," "unless otherwise agreed," "subject to any agreement to the contrary," and "in the absence of any agreement to the contrary." *See also* § 9A–103(a). Thus, when conflicts between partners arise, courts must first look to the partnership agreement to resolve the issue:

> "The agreement, whatever its form, is the heart of the partnership. One of the salient characteristics of partnership law is the extent to which partners may write their own ticket. Relations among them are governed by common law

and statute, but almost invariably can be overridden by the parties themselves. As one court has long put it, *the agreement is the law of the partnership."* (Emphasis added)(footnote omitted).

*Seattle–First Nat. Bank v. Marshall,* 31 Wash.App. 339, 641 P.2d 1194, 1199 (1982)(quoting JUDSON A. CRANE & ALAN R. BROMBERG, LAW OF PARTNERSHIP § 5, at 43 (1968)).

The pertinent paragraph and subsections of the Joe's Racing partnership agreement are as follows:

"7. TERMINATION

(a) That, at the termination of this partnership a full and accurate inventory shall be prepared, and the assets, liabilities, and income, both in gross and net, shall be ascertained: the remaining debts or profits will be distributed according to the percentages shown above in the 6(e).

\* \* \*

(d) Upon the death or illness of a partner, his share will go to his estate. If his estate wishes to sell his interest, they must offer it to the remaining partners first."

█ Even though the partnership agreement uses the word "termination," paragraph 7(a) is really discussing the dissolution of the partnership and the attendant winding-up process that ultimately led to termination. Paragraph 7(a) requires that the assets, liabilities, and income be "ascertained," but it in no way mandates that this must be accomplished by a forced sale of the partnership assets. Indeed, a liquidation or sale of assets is not mentioned anywhere in 7(a).

In this case, the winding-up method outlined in 7(a) was followed exactly by the surviving partners: a full and accurate inventory was prepared on August 31, 1995; this information was given to an accountant, who ascertained the assets, liabilities, and income of the partnership; and finally, the remaining debt or profit was distributed according to the percentages

listed in 6(e).[6]

Mrs. Creel argues that the partnership agreement does not address the winding-up process and that we should look to UPA's default rules to fill in this gap. Her contention is incorrect. We only turn to UPA and its liquidation rule if there is no other option, and such is clearly not the case here. While this partnership agreement was drafted without the assistance of counsel and is not a sophisticated document that provides for every contingency, if it states the intention of the parties it is controlling. As we stated in *Klein v. Weiss:*

"A partnership is, of course, a contractual relation to which the principles of contract law are fully applicable.... One of the essential elements for formation of a contract is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms." (Citations omitted).

284 Md. 36, 63, 395 A.2d 126, 141 (1978).

Thus, when we look to the intention of the parties as reflected in 7(a) of the partnership agreement, the trial judge could conclude that the partners did not anticipate that a "fire sale" of the partnership assets would be necessary to ascertain the true value of Joe's Racing. Paragraph 7(a) details the preferred winding-up procedure to be followed, to include an inventory, valuation, and distribution of debt or profit to the partners.

Moreover, paragraph 7(d), which discusses what happens to a partner's share of the business upon his death, also makes no mention of a sale or liquidation as being essential in order

---

**6.** Paragraph 6(e) of the partnership agreement states "[t]hat the net profits or net losses be divided as follows:

| | |
|---|---|
| Joseph Creel | 28% |
| Arnold Lilly | 24% |
| Joseph Cudmore | 24% |
| Roy Altizer | 24%" |

As determined by the trial court, the interest of Joseph Cudmore, who never signed the partnership agreement, reverted to Joseph Creel, who was entitled to a 52 percent share.

to determine the deceased partner's proportionate interest of the partnership. On the contrary, 7(d) appears to be a crude attempt to draft a "continuation clause" in the form of a buy-out option by providing that the deceased partner's share of the partnership goes to his estate, and if the estate wishes to sell this interest it must first be offered to the remaining partners. *See* § 9A–701, which details the purchase of the dissociated partner's interest. In contrast to consenting to the continuation of the business, Mrs. Creel made it plain that she wanted the business "dissolved and the affairs of the company wound up;" however, this does not mean a liquidation was required. Particularly in light of Maryland's recent adoption of RUPA, paragraph 7(d) of the partnership agreement can be interpreted to mean that because Mrs. Creel did not wish to remain in business with Lilly and Altizer, they had the option to buy out her deceased husband's interest.

In short, when subsections (a) and (d) of paragraph 7 are read in conjunction, it is apparent that the partners did not intend for there to be a liquidation of all partnership assets upon the death of a partner. Paragraph 7(a) delineates the winding-up procedure, which was methodically followed by Lilly and Altizer. Paragraph 7(d) dictates what happens to the partnership in the event of a partner's death, and it can be interpreted as allowing a buy-out option if the deceased partner's estate no longer wishes to remain in business with the surviving partners, as was clearly the case here. Therefore, the trial judge could have concluded that Lilly and Altizer exercised this 7(d) buy-out option, and subsequently began a new partnership, when they followed the winding-up procedure dictated by 7(a) and presented the Creel estate with its share of Joe's Racing.[7]

---

7. Lilly and Altizer originally offered Mrs. Creel a share based on a 36 percent interest of the partnership; however, this percentage was later adjusted to 52 percent by the trial court and applied retroactively to the August 31, 1995, wind up and termination date of Joe's Racing. Neither Lilly nor Altizer dispute this percentage in this appeal.

█ Assuming *arguendo* that the Joe's Racing partnership agreement cannot be interpreted as outlining an alternative to liquidation in winding up the partnership in the event of a dissolution caused by a partner's death, we still find that a sale of all partnership assets is not required under either UPA or RUPA in order to ascertain the true value of the business. Support for this is found in Maryland's recent adoption of RUPA, which encourages businesses to continue in either their original or successor form, and also the holdings of out-of-state cases where other options besides a "fire sale" have been chosen when a partnership is dissolved under UPA. *See* full discussions in Part II.A. and B., *supra.*

We agree with the trial court and the intermediate appellate court that there is nothing in Maryland's UPA, in particular §§ 9–608 and 9–609, or any of our case law that supports an unequivocal requirement of a forced sale in a situation akin to the instant case. The one case Mrs. Creel relies on, *Comp. of Treas., supra,* is inapposite for the following reasons, as succinctly stated by the Court of Special Appeals:

"Finally, appellant relies on a sentence in [*Comp. of Treas.*]: 'A liquidation is generally defined as the winding up of a business or enterprise.' Such reliance is a classic example of the fallacy of assuming that a word, phrase, clause, or sentence used in one context will have the same meaning in a totally different context. The issue in [*Comp. of Treas.*] was whether a certain transaction was subject to the Maryland retail sales tax or exempt as a casual and isolated sale 'by a vender who is not regularly engaged in the business of selling tangible personal property.' The sale in question was one of equipment formerly used by the vendor who was liquidating all of his business assets with the intention of retiring. The comptroller pointed out that the liquidation of assets process was drawn out, but the court held that the sale was 'in conjunction with a complete liquidation of a person's business' and was therefore not taxable. *To rely on a statement that a liquidation is generally defined as a winding up of a business or enterprise, in the context of determining whether a sale of a business['s] assets is a*

*taxable transaction as equivalent to a holding that winding up the affairs of a dissolved partnership means liquidation is patently ludicrous."* (quoting *Comp. of Treas.,* 209 Md. at 501, 121 A.2d at 856)(Emphasis added).

### b.

We find it is sound public policy to permit a partnership to continue either under the same name or as a successor partnership without all of the assets being liquidated. Liquidation can be a harmful and destructive measure, especially to a small business like Joe's Racing, and is often unnecessary to determining the true value of the partnership. *See Arnold v. Burgess,* 113 Idaho 786, 747 P.2d 1315, 1322 (Idaho Ct.App. 1987)("A forced sale of partnership assets will often destroy a great part of the value of the business and may prevent the continuation of a valuable source of livelihood for former partners."). We now explore the "true value of the partnership" issue and whether liquidation is the only way to obtain it.

█ In the instant case, per paragraph 7(a) of the partnership agreement and § 9–614 of UPA,[8] the Creel estate had the right to ask the surviving partners for an accounting of Mr. Creel's interest in Joe's Racing as of the date of dissolution. We agree with the Court of Special Appeals when it stated, however, that *"[t]he right to an accounting is not a right to force the winding up partners to liquidate the assets.* The personal representative of a deceased partner is entitled to receive, on behalf of the estate, as an ordinary creditor, the value of the decedent's partnership interest as of the date of dissolution, *i.e.,* the date of the decedent's death." (Emphasis added).

---

**8.** Section 9–614, "Accrual of right to account," provides:

"The right to an account of his interest shall accrue to any partner, or his legal representative, as against the winding up partners or the surviving partners or the person or partnership continuing the business, at the date of dissolution, in the absence of any agreement to the contrary."

In accordance with both the partnership agreement and UPA, Lilly and Altizer provided Mrs. Creel with an accounting, which was based on the valuation performed by the accountant they hired. Mrs. Creel contends that this accounting did not reflect the true value of Joe's Racing, and as a result the estate did not receive its proportionate share of the partnership.

■ First, we note that Mrs. Creel did not contest the figures that the surviving partner's accountant derived until approximately a year and a half after her husband's death and one month before trial. At this late date, Mrs. Creel made a request for a court-appointed auditor per Maryland Rule 2–543(b) but the trial court correctly found that "where a request for an auditor is made one month before trial in an action pending in excess of one year, such a referral would cause unnecessary delay in the resolution of this case. Furthermore, the Court ... finds that the interests of the parties can be properly determined by the Court." Moreover, if Mrs. Creel was so concerned that the accounting rendered by Lilly and Altizer's accountant was incorrect, then she should have immediately hired her own appraiser to review the accountant's work and/or make an independent valuation of Joe's Racing. As the *Rinke* court so aptly stated:

"[W]e think the failure on the part of cross-plaintiffs to offer evidence as to the value of the assets used by plaintiffs, or either of them, precludes them from now contending that the decree from which they have appealed should be set aside on this ground. *The trial court determined the issues before him on the basis of the proofs of the parties. This court is necessarily governed by the record before us.*" (Emphasis added).

48 N.W.2d at 207.

■ Second, we disagree as to Mrs. Creel's argument that the accountant's valuation was in error and that the trial court subsequently arrived at an incorrect distribution of Mr. Creel's interest in the partnership. Mrs. Creel maintains that the only way to ascertain the true value of her deceased

husband's interest in Joe's Racing is to liquidate all of its assets but we agree with the trial court, which held: "The surviving parties under the Code and existing case law had to account for the inventory and pay to the Estate its appropriate share, *but not sell off the assets in a liquidation sale.*" (Emphasis added). In making his findings, the trial judge looked to paragraph 7(a) of the partnership agreement and also § 9–611 of UPA, which outlines the rules of distribution in settling accounts between partners after dissolution. The court held:

> "The Court finds that directions of Section 9–611 are similar to clause 7 (termination) of the Partnership Agreement and the Court will now apply that analysis. The partnership assets are $44,589.44. The Court accepts the valuation prepared by Mr. Johnson [the accountant] as the correct statement of value. The Court determines the debts to creditors to be the accounting fees due Mr. Johnson in the amount of $875.00. The debts owed to partners are: (1) $495.00 to Mrs. Creel; (2) $2,187.00 to Mr. Lilly[;] and (3) $900.00 to Mr. Altizer. The capital contributions are determined to be $15,000.00 to Mr. Creel and $6,666 each to Mr. Altizer and Mr. Lilly. The Estate is also due 52% of the balance of the $11,800.00 or $6,136.00. *The total due to the Estate, therefore, is declared to be $21,631.00* ($15,000.00 + $495.00 + $6,136.00)."

Finally, Mrs. Creel contends that the accountant's valuation improperly considered only the book value of the business and not its market value. "Book value" refers to the assets of the business, less its liabilities plus partner contributions or "equity." "Market value" includes the value of such intangibles as goodwill, the value of the business as an ongoing concern, and established vendor and supplier lines, among other factors. Again, we concur with the trial court's findings as to the valuation of Joe's Racing.

In making no finding of goodwill value, for example, the trial court likely considered the fact that Joe's Racing had only been operating a little over a year before the partnership

was formed, and after Lilly and Altizer became partners with Mr. Creel the business was only in existence for nine months before Mr. Creel died. On these facts, it is reasonable for the trial court to conclude—without any evidence presented to the contrary—that a small business selling NASCAR memorabilia, which had been operating for barely two years, did not possess any goodwill value.

### c.

Our goal in this case, and in cases of a similar nature, is to prevent the disruption and loss that are attendant on a forced sale, while at the same time preserving the right of the deceased partner's estate to be paid his or her fair share of the partnership. With our holding, we believe this delicate balance has been achieved. For the reasons stated, we hold that paragraph 7, subsections (a) and (d), of the partnership agreement should be interpreted as outlining an alternative method of winding-up Joe's Racing and arriving at its true value other than a "fire sale" of all its assets. Even if there were no partnership agreement governing this case, however, we hold that Maryland's UPA—particularly in light of the legislature's recent adoption of RUPA—does not grant the estate of a deceased partner the right to demand liquidation of a partnership where the partnership agreement does not expressly provide for continuation of the partnership and where the estate does not consent to continuation. To hold otherwise vests excessive power and control in the estate of the deceased partner, to the extreme disadvantage of the surviving partners. We further hold that where the surviving partners have in good faith wound up the business and the deceased partner's estate is provided with an accurate accounting allowing for payment of a proportionate share of the business, then a forced sale of all partnership assets is unwarranted.

### 2. Damages Issue

The second issue is whether the Creel estate is entitled to its partnership percentage share of the profits generat-

ed by the surviving partners' alleged continued use of the partnership assets. Mrs. Creel argues that because Lilly and Altizer did not liquidate the partnership as she demanded, they continued the partnership with the use of partnership property and inventory. For this reason, and also because she alleges they did not pay her the proper share of Joe's Racing, Mrs. Creel claims she is entitled to damages from this continued use.[9] Her contention can be quickly dispensed with

---

9. Section 9–613, "Rights of retiring partner or estate of deceased partner when business is continued," provides:

"When any partner retires or dies, and the business is continued under any of the conditions set forth in § 9–612(a), (b), (c), (e), and (f) or § 9–609(b)(2), without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, *or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership;* provided that the creditors of dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this section, as provided by § 9–612(h)." (Emphasis added).

Both the trial court and the Court of Special Appeals concluded that because Joe's Racing "was not continued under any of the conditions set forth in § 9–612 or § 9–609(b)," Mr. Creel's estate had no right to a share of the profits from Good Ole Boys under § 9–613. We agree with this finding, for the reasons stated *infra.*

In her reply brief to this Court, Mrs. Creel contends she never argued to the courts below that her claim for profits derived from § 9–613 and that this issue was raised *sua sponte.* Instead, Mrs. Creel maintains that she is entitled to "continued use" profits under § 9–404, "Partner accountable as a fiduciary," which provides:

"(a) *Accounting required.*—Every partner must account to the partnership for any benefit, *and hold as trustee for it any profits derived by him without the consent of the other partners* from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

(b) *Applicability to estates of deceased partners.*—This section applies also to the representatives of a deceased partner engaged in the liquidation of the affairs of the partnership as the personal representatives of the last surviving partner." (Emphasis added).

As we discuss *infra,* Lilly and Altizer wound up the partnership in good faith and did not improperly retain any Joe's Racing profits from Mrs. Creel that were earned up to August 31, 1995. After this date, any

due to the trial judge's implicit finding that Joe's Racing was not continued, but instead was properly wound up on August 31, 1995. Therefore, as Good Ole Boys is a successor partnership to Joe's Racing and not a continuation business, there are no "continuation" damages at issue.

When the winding-up process is complete, any monies owed to the deceased partner's estate cease as of this date. The courts below correctly found that Joe's Racing was wound up as of August 31, 1995; thus, the Creel estate is not owed anything beyond this date. We agree with the trial court's finding that the surviving partners "sought to close out the partnership and took all reasonable steps to do so." Lilly and Altizer did all that was required per paragraph 7 of the partnership agreement and § 9–609(a) of UPA to efficiently and in good faith wind up the partnership; within two months of Mr. Creel's death, the partnership had been properly wound up and terminated. We concur with the trial court's finding that "the proper method of winding up is outlined generally in Section 9–609(a), which states that persons claiming through a partner in a dissolution situation may have the partnership's property applied to discharge its liabilities and the surplus applied to pay in cash the net amount owing to the respective parties."

The trial judge found that "[a]ll parties agree that all records were turned over to the Personal Representative of the Estate, up to August 31, 1995." Further evidence that accords with the trial judge's conclusion that Joe's Racing was properly wound up by August 31, 1995, was that the surviving partners: (1) conducted a complete inventory of the stock and determined the accounts receivables on August 31, 1995; (2) hired an accountant, who used the August 31, 1995, figures to accurately determine the value of the partnership so that proper distributions could be made per the partnership agree-

---

profits that the surviving partners derived from their new partnership, Good Ole Boys, were theirs to retain and they had no duty, under § 9–404 or otherwise, to account to Mrs. Creel for any monies earned thereafter.

ment and § 9–611 of UPA; (3) ceased doing business as Joe's Racing as of August 31, 1995, and began doing business under the new name of Good Ole Boys Racing as of September 1, 1995, in accordance with an amended trader's license; (4) placed a new sign in the store front reading "Good Ole Boys Racing;" and (5) entered into a new lease with the shopping mall.

Thus, we agree that the winding up of Joe's Racing was completed on August 31, 1995, and that Good Ole Boys is a successor partnership that began operations on September 1, 1995, and not a continuation of Joe's Racing. As such, the Creel estate is not entitled to a share of any profits generated by the surviving partners' alleged continued use of the partnership assets.

## III. CONCLUSION

We hold that Maryland's UPA does not grant the estate of a deceased partner the right to demand liquidation of a partnership where the partnership agreement does not expressly provide for continuation of the partnership and where the estate does not consent to continuation. Winding up is not always synonymous with liquidation, which can be a harsh and unnecessary measure towards arriving at the true value of the business. A preferred method in a good faith winding up is the one used in this case—the payment to the deceased partner's estate of its proportionate share of the partnership. Thus, we further hold that where the surviving partners have in good faith wound up the business and the deceased partner's estate is provided with an accurate accounting allowing for payment of a proportionate share of the business, then a forced sale of all partnership assets is generally unwarranted. Finally, we hold that because Good Ole Boys is a successor partnership and not a continuation of Joe's Racing, the Creel estate is not entitled to a share of any profits generated by the surviving partners' alleged continued use of the partnership assets.

JUDGMENT OF THE COURT OF SPECIAL APPEALS
AFFIRMED. COSTS IN THIS COURT AND THE COURT
OF SPECIAL APPEALS TO BE PAID BY PETITIONER.